# THE BATAVIA MANUFACTURING COMPANY
## *v.*
# THE NEWTON WAGON COMPANY.

1. DEED—*construction.* If the intention of the parties to a deed for land with right to the use of certain water power can be ascertained as well from the attendant circumstances, the situation of the parties, and the state of the thing granted, as from the language employed in the deed, effect must be given to it.

2. SAME—*construed as to right to water power.* Where a party, by deed, conveys all of his land west of the center of a river over which he has a dam erected, and one-half of the water power afforded by the dam to be drawn or taken from any point west of the center of the river, covenanting to keep the

dam up to the same height, it will be considered that it is the right to the use of the momentum of water in its passage, and not a given quantity of water, that is the subject of the grant aside from the land conveyed, and the right to the other half of the water afforded by the dam will be restricted in its exercise to the east center of the main channel of the stream, the right to draw or use the water at any point west of the center of the stream by the grantee necessarily excluding the grantor from the exercise of the same right.

3.   Water power—*grantor of not interested in its use after it passes below him.* The grantee of one-half of the water power afforded by a dam, after the water has passed from the upper pond through a sluiceway into a lower pond, created by a lower dam across a slough, will have the undisputed control of the use of the water in such lower pond, and the grantor or his assigns can only object that, by enlargement of the sluice, more water is drawn into the lower pond than the original grant authorized, but in what manner the water, when there, shall be distributed as motive power, will not concern the original grantor.

4.   Same — *grant of part of water power construed.*   A deed for certain land abutting upon a mill pond granted the right to use through a raceway from the pond the following described amount of water, the grantor first reserving and setting apart as preferred water power, for his own use or the use of his assigns, 600 square inches of water, to be drawn under the full head that could or might be obtained, and one-sixth part of the residue, or of whatever water the grantor might have for use for water power, over and above the said 600 inches, the said grantor conveyed to the party of the second part:   *Held,* that after the reservation of 600 inches of preferred water, the grant passed one-sixth of the *whole* of the residue of the water power, and not of the *half* merely, and this, too, not simply of the water power *then* obtained, but of the *full head that could or might be obtained.*

5.   Same—*right to use under contract.*   Where the owner of a water power on a river grants, by deed, one-half of the water of the stream, with the right to draw or use the same from the pond of the grantor, created by a dam, to be taken at any point west of the center of the stream, the grantee, and those claiming under him, can not claim, as against the grantor and his assigns, the right to draw more than one-half of the water of the river into a lower mill pond, but this is subject to the implied condition that the grantor or his assigns are in a condition to make an application of the other half as motive power, for the grantor has no property in the water itself, and is not entitled to detain or control it except for the propelling of machinery by its momentum.

6.   This does not deny in the grantor or his assigns the power to enter into valid contracts to abridge the use of one-half or any less quantity of water in propelling machinery, so as to allow a greater quantity to flow into the lower pond; but since such a contract can not be a sale of the water of the river, or its momentum, which they can only use on their own soil, it can but amount to an estoppel of their right to use the momentum of so much water,

leaving the water, after passing into the lower pond, to be used in accordance with the rights of those entitled to share in such power.

7. The owner of one-half of the water power of a river to be taken from the west half of the stream, acquiring subsequently to a grant of a portion of such motive power to others, six hundred square inches of preferred water from the east side of the stream, occupies precisely the same position as to his grantees as if he had increased the flow of water into his mill pond on the west side by turning a creek conveying a like quantity of water into the same, which before had emptied into the river below it. In either case he would not be legally entitled to a preference as to such additional supply as against other owners of water power in such stream, nor can he enforce contribution from such other owners for the expenses incurred in obtaining the additional supply, if the act was purely voluntary, and uninfluenced by any express or implied promises of contribution.

8. SAME—*under contract for separate uses of water power, use must be reasonable.* Although a party owning a mill pond affording water power for the propelling of machinery, in granting a portion of the same to another, may have reserved 600 square inches of preferred water from the pond for his own use, he will be restricted to a reasonable use of the same, and will not be permitted to use the same in an unreasonable manner to the prejudice or injury of his grantee, and the reasonableness of such use is not to be measured alone by the necessities of the business of the grantor, but. also by the circumstances of the condition or stage of water and the rights of the grantor and other owners of water power on the same pond, and the manner of the reasonable and proper use of the water of the stream by upper riparian proprietors.

9. SAME—*party having preferred right to a given amount can not use the same to injury of party having an interest in the surplus.* Where the owner of a mill pond, after reserving for his own use 600 square inches of water for motive power, grants to another one-sixth of the residue, retaining the other five-sixths, he may use the whole of the preferred water if it can be done without injury to his grantee, but not in such a manner as to destroy or injure his grantee's right to the use of his one-sixth part of the residue.

10. In such case where it is the custom of mill owners above to run their mills by day and shut down their gates by night to accumulate a head of water, if the grantor runs his mill and machinery by night, so as to draw off the water in the pond, leaving no head from which the grantee can take his portion during the daytime, he can not maintain any action against his grantee for taking and using of the water in the pond an amount of water he would be entitled to by a proper and reasonable use on the part of the grantor.

11. The question of what is a reasonable use of the water of a mill pond by parties having common interests in the same, is one of fact to be determined by the jury.

12.  SAME—*rights of grantee of a part against party bound to keep up dam.* Where the owner of a mill dam across a river conveyed land from the center of the river and below the dam with one-half of the water power to be drawn from the mill pond above, and covenanted for himself, his heirs and assigns to keep up the dam at its then height, and the grantee conveyed the land, with the water power, and the benefits and rights he held, to have the dam kept up and in repair, and the second grantee conveyed a part of the same land and a portion of his water power after first reserving a certain number of square inches as preferred water for his own use, it was *held,* that it was the duty of the last grantor to keep in repair the dam so as to prevent leakage to an unreasonable degree for the protection of his grantee or assigns, and that if he did not, the latter was not bound to suffer the loss, but might rightfully use his proportion of the surplus water that he would have had if the dam had been kept in reasonable repair.

13.  Where a party whose duty it is by law to keep a dam in proper repair so as to preserve the water for his own use and that of another claiming under him and entitled to a proportionate share in its use for propelling machinery, permits the water to escape through the dam, which by the use of reasonable care he could have detained for use, the loss must fall upon him and not upon the party claiming under him.

14.  COVENANT—*when it runs with the land.* Where a party conveys land upon a stream of water with the use of half of the water to be drawn from a pond created by his dam, and covenants to keep such dam up and in repair, the right to have the dam kept up and in repair will pass by conveyance by deed granting the same, and may be enforced; but a remote grantee of a part of the premises to whom no right is conferred to enter upon the dam and make repairs, can not do so.

15.  EVIDENCE—*no error to exclude evidence of what is admitted.* Where the title of a party through a certain deed is admitted by the stipulation of the parties, there is no error in not admitting such deed in evidence.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon. H. H. CODY, Judge, presiding.

Mr. J. F. FARNSWORTH, Mr. B. F. PARKS, and Mr. T. C. MOORE, for the plaintiff in error.

Mr. CHARLES WHEATON, and Mr. EUGENE CANFIELD, for the defendant in error.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was an action on the case, by the Batavia Manufacturing Company against the Newton Wagon Company, for a diversion of water power used in propelling machinery.

On trial in the court below, the jury returned a verdict for the defendant. The court, after overruling a motion for a new trial, gave judgment upon the verdict, and the case comes here upon the plaintiff's appeal.

The first question to be passed upon arises upon the giving and refusing of instructions in regard to the construction of deeds under which the respective parties claim, upon the question of the quantity of water to which the plaintiff is entitled to a preference over the defendant.

The plaintiff claims a preference of 1200 square inches, while the defendant contends that it is entitled to but 600 square inches.

The ruling was in favor of the contention of the defendant.

The facts material to this question are as follows: In 1837, John Van Nortwick, Lester House and Alanson Barker claimed the lands on both sides of Fox river at the village of Batavia, in Kane county, and subsequently obtained the government title therefor. There was an island in the river, at this point, formed by the main channel of the river on the east and a slough, through which the preponderance of the evidence shows a channel ran—(very small in the dry season of the year but enlarging with the increase of the flow of the water in the river,) on the west. In the year above named, a dam was built at or near the head of the island across the main branch of the river on the east, and a small dike of stones and sticks was constructed from the head of the island across the slough on the west. In 1844, Barker & House and Van Nortwick made a division of the land and water power, and, on the 2d of August of that year, Barker & House conveyed to Van Nortwick the land west of the center of Fox river, as it then ran, and

the following described water power, viz: "One-half the water of said Fox river, with the right to draw or use the same from the present pond or otherwise at any point west of the center of said river as it now runs." And the deed also contains this covenant: "And the said parties of the first part, for themselves, their heirs and assigns, do hereby covenant, promise and agree to and with the said party of the second part, his heirs and assigns, to ever maintain and keep in repair a dam across said river on the *stile* [site] of the present dam at Batavia, and at the same height, and in case they shall neglect to do so, then the said party of the second part, his heirs and assigns, after due notice being given, may repair or build said dam—the cost of which shall be paid by the said party of the first part, their heirs or assigns." Immediately after the execution of this deed, Van Nortwick made an embankment across the slough at the head of the island and opened a race through it to let in water, thus forming a mill pond of the slough on the west of the island; and, at the same time, he also erected an embankment, bulkhead or dam across the slough, at the south end of the island, and built a saw mill supplied by water from this pond by means of a gate. This mill continued to be operated by Van Nortwick and those claiming under him until long after the rights of the defendant had accrued in the water power in controversy. On the 1st of April, 1857, Van Nortwick conveyed to a then existing corporation called "The Batavia Manufacturing Company"— (not the plaintiff)—certain lands, which embrace the island and land under the mill pond west of it, including said saw mill, embankments, bulkheads and fixtures, and also all his right and interest in the water power, etc. This deed contains, also, this grant: "The said first party also conveying to said second party the benefits and rights accruing to him or his assigns from the obligations of other owners of water power on the east side of the river to keep up and maintain the dam across said river, the said second party being obligated to keep up and maintain the racks connected therewith on the

west side of said river." On the same day, the Batavia Manu-
facturing Company conveyed to Levi Newton a part of the
island abutting upon what is now called Wilson street, and
also abutting upon the mill pond on the west and the river
on the east, and this conveyance contains this further grant:
" The right to keep open and use the raceway now opened across
said lands and street from said pond to Fox river, and to use,
through the same, the following described amount of water—
the said company, party of the first part, first reserves and sets
apart as preferred water power for its own use, or the use of
its assigns, 600 square inches of water, to be drawn under the
full head that can or may be obtained, and one-sixth part of
the residue, or of whatever water said company may have for
use for water power over and above the said 600 inches, said
company hereby conveys to said party of the second part."
And this covenant then follows : "And the said party of the
second part covenants and agrees to bridge said raceway across
Mechanic street and keep said bridge in good repair, and he
further covenants and agrees to pay one-twelfth part of all the
costs and expenses to which the company may be liable or
may incur from time to time in improving or elevating or re-
pairing the dam over Fox river or the embankment at the
south end of the pond, as may be by them deemed expedient
and necessary in securing and maintaining the water power."
It appears that the contracts for purchase of the land and
water rights conveyed by these deeds were made, respectively,
between Van Nortwick and the Batavia Manufacturing Com-
pany and Levi Newton and the Batavia Manufacturing
Company, in June, 1854, and at that time the Batavia Manu-
facturing Company entered into the possession of the property
purchased by it, with the exception of that portion sold to
Newton, and that Newton entered into possession of that and
shortly thereafter erected buildings thereon for a wagon shop,
and the same fall commenced to dig his race, which he com-
pleted the following spring or summer: so that, when the
deed was executed Newton's buildings had been completed, the

raceway dug across the land and the whole in use by him for some time. The Batavia Manufacturing Company had also erected a large stone building at the south end of the mill pond for a car shop, put in two water wheels of 300 inches each, and was carrying on its business of manufacturing, for some time, before the execution of its deed.

It does not appear that, at the time of the execution of the deed, the Batavia Manufacturing Company had ever used more than 600 square inches of water, or made claim of the right to use more than that amount as preferred water.

February 25, 1860, the Batavia Manufacturing Company conveyed to the Fox River Manufacturing Company all the property, including the water rights conveyed to it by Van Nortwick, except such as had been conveyed to Newton. April 16, 1861, the Fox River Manufacturing Company conveyed certain parts of the land conveyed to it, as above, to Samuel D. Lockwood, and the following described water power, viz: "The water power purchased of John Van Nortwick by the Batavia Manufacturing Company was thus subdivided: 600 inches is reserved as preferred water power, to be used at said car shops, and the remainder is divided into six equal parts, and two of these parts (or one-sixth of the water power after reserving, as above, 600 inches,) are hereby conveyed to said party of the second part, to be used at the race of said saw mill." May 12, 1862, the Fox River Manufacturing Company conveyed other portions of its land to Levi Newton, and on the second day of May, 1862, it executed a deed to certain persons, designated in argument as Howland & Co., for the remainder of its land conveyed to it as above, with the following grant of water power, viz: "All of the water rights and privileges conveyed by John Van Nortwick to the Batavia Manufacturing Company, * * * excepting therefrom one-half of whatever water or water power which shall remain after reserving as preferred water power 600 square inches of water, to be drawn under the full head that can or may be obtained;" and the conveyance was made subject to

this proviso: "*Provided,* that nothing in this conveyance shall interfere with the rights to water or water power of other parties,"—said parties being Levi Newton and Samuel D. Lockwood, holding under conveyances from either the Batavia Manufacturing Company or the Fox River Manufacturing Company.

May 10, 1862, McKee & Moss, who had obtained the same by deed from Barker & House, conveyed to Howland & Co. the following described water power, viz: "600 square inches of preferred water from their undivided east half of Fox river, to be drawn from said McKee & Moss' mill pond, and used by said party of the second part in propelling machinery on the premises recently purchased by them from the Fox River Manufacturing Company,—meaning by said 600 square inches the amount of water that will pass through an aperture of that size, under the full head that may be obtained on their premises when the pond is full."

Howland & Co., on the 17th day of February, 1865, conveyed the land and water power which they owned to the Batavia Paper Mill Company, and, after describing the water power which they had derived from the Fox River Manufacturing Company, and lands connected therewith, the deed has this proviso: "*Provided,* that nothing in this conveyance shall interfere with the right to water or water power of other parties,"—said parties being Levi Newton and Samuel D. Lockwood, holding under conveyances from either the Batavia Manufacturing Company or the Fox River Manufacturing Company. The same property and water rights were conveyed by the Batavia Paper Mill Company to the Chicago Fibre and Paper Company, on February 1, 1867, subject to the same proviso, and on the 17th of August, 1870, the assignee in bankruptcy of the last named company conveyed the same property and water rights, subject to the same proviso, to the plaintiff.

The property and water rights of Levi Newton were con-

veyed to the defendant long prior to the existence of the present claimed cause of action.

What was the intention of the parties in using the language with reference to water power, found in the deed of the Batavia Manufacturing Company to Levi Newton? For if that intention can be ascertained, as well from the attendant circumstances,—the situation of the parties and the state of the thing granted,—as from the language employed in the deed, effect must be given to it. *Hadden* v. *Shoutz*, 15 Ill. 581.

It is very true, as insisted by counsel for plaintiff, that the deed of Barker & House to Van Nortwick, and, therefore, necessarily, the deed of Van Nortwick to the Batavia Manufacturing Company, only conveyed one-half of the water power afforded by the dam, and that the other half must have remained in them, and have passed to the present plaintiff as their remote grantee. But it is to be considered it was water power,—that is to say, the right to the use of the momentum of water in its passage,—and not a given quantity of water, that was or could have been the subject of the grant; and to Van Nortwick was granted all the land, including the slough, west of the center of the main channel of the river, on which the grantors had any right to erect works and make the necessary improvements whereby the water power could be controlled and used for profit; and it was, moreover, expressly stipulated, that he was to have the right to draw or use the water from the pond then existing, or otherwise, at any point west of the center of said river as it then run, which, of itself, necessarily excludes the grantors from the exercise of the same right. It can hardly admit, therefore, of rational controversy, that while there still remained in Barker & House the right to one-half the 'water power afforded by the dam, it was restricted in its exercise to the east of the center of the main channel of the river, and this is the only right, as against Newton, that could be transferred to the grantees of Barker & House.

The Batavia Manufacturing Company, as owner of the island

and of the slough which was converted into a mill pond by the erection of the lower dam and the opening of sluice ways through the dike at the head of the island, had the undisputed control of the water power at this point. When the water had reached this pond, it had passed beyond any point where it could be used as motive power east of the center of the main channel of Fox river. Moss & McKee could, at most, but object that, by the enlargement of the sluice ways, more water was drawn into this pond than the grant of Barker & House to Van Nortwick authorized; but in what manner the water, when there, should be distributed as motive power, could not concern them in the least.

The language employed shows, that the water, when drawn into the pond at the west of the island, was considered by the parties as for the exclusive use of the owner of that pond, and the grant to Newton is, after the reservation of the 600 inches of preferred water, one-sixth of the *whole* of the residue of the water power, and not of the *half*, merely, and this, too, not simply of the water power *then* obtained, but of *the full head that can or may be obtained;* and the conveyances under which plaintiff claims expressly recognize the rights thus granted, to the extent imported by its terms. So, also, the deed of the Fox River Manufacturing Company to Levi Newton, although probably not to be considered as an enlargement of Newton's water right, is fairly entitled to be considered as a subsequent recognition and confirmation of the grant to him by the Batavia Manufacturing Company, according to the import of the terms in which that grant is made.

. Van Nortwick, and those claiming under him, undoubtedly could not claim, as against Barker & House, and those claiming under them, the right to draw more than one-half of the water of Fox river into this pond, but this, however, is subject to the implied provision that Barker & House were in a condition to make an application of the other half as motive power, for it is not pretended they had a property in the water itself, or were otherwise entitled to detain or control it than for the

propelling of machinery by its momentum, and so they could have no title or interest in the water not actually and properly appropriated in propelling their machinery. *Tyler* v. *Wilkinson*, 4 Mason, 397. This, it is true, does not deny in Barker & House, or their grantees, the power to enter into valid contracts to abridge their use to one-half or any less quantity of water in propelling their machinery so as to allow a greater amount to flow into the lower pond; but, since such a contract could not be a sale of the water of the river, or of its momentum, (which they could only own the right to use on their own soil,) it could but amount to an estoppel of their right to use the momentum of so much water, leaving the water, after passing into the lower pond, to be used as motive power in accordance with the rights of those there entitled to share in such power. Hence the grantee of the 600 inches of preferred water from the east side of the river occupies precisely the same position that it would, had it increased the flow of water into the pond west of the island by turning a creek conveying a like amount of water into the pond, which had before emptied into the river below it. In such case, it may be conceded, there would be a strong natural equity in its favor against other owners of water power on the pond, for contribution on account of the expense it had so incurred, but there would not be the slightest pretence for saying that it was legally entitled to a preference to the amount of water thus added; nor could it enforce contribution for the expenses it had incurred, under any known rule of law—assuming, of course, that its act had been purely voluntary and uninfluenced by express or implied promises of contribution.

Here, moreover, we have the express stipulation that Levi Newton and his grantees shall have the benefit of *any head that can or may be obtained.* Levi Newton was neither party nor privy to the arrangement by which the 600 inches of water from the east side of the river was endeavored to be secured, and can not, therefore, be assumed to have consented that it should be transferred as preferred water to the pond west of

the island. As to him, the case is as if that contract had not been made. We see no objection, in any respect, to the ruling upon this point.

The question next presented arises upon the instructions in reference to the manner in which the respective parties were entitled to use the water.

The court declined to instruct the jury, as asked by the defendant, that "the question of reasonable use of the water by the plaintiff, as between the plaintiff and defendant, and as affecting the rights of the defendant, does not arise in this case as to the 600 inches of preferred water power on the east half of the river, but only as to the use of the plaintiff's water over and above the 600 square inches on the west half of said river;" but gave the following, as asked by the plaintiff:

"As to the question of reasonable use of the water by the plaintiff, the jury have the right to consider the character and value of the plaintiff's mill and machinery, and the necessity, if there was such, that it should be run continually, and all the circumstances connected with the same."

And the court, on the request of the defendant, gave these instructions:

"The jury are instructed, that while, under the reservation in the deed of April 1, 1857, from the Batavia Manufacturing Company to Levi Newton, there was reserved to said company the right to 600 inches of preferred water from said mill pond, which right the plaintiff now claims; yet the plaintiff, in the exercise of such right, is restricted to a reasonable use of such water, and the plaintiff would not be permitted to use the same in an unreasonable manner, and the reasonableness of such use is not to be measured alone by the necessities of the business of the plaintiff, but also by the circumstances of the condition or stage of water and the rights of the plaintiff and other owners of water power on said pond and the manner of the reasonable and proper use of the water of said stream

by riparian proprietors above the said works at Batavia, so far as circumstances, rights and reasonable and proper use are shown by the evidence, and by all the evidence in the case showing the reasonableness or the unreasonableness of such use.

"If, therefore, the jury believe, from the evidence, that the plaintiff, during the dry season and scarcity of water in the summer of 1874, in the night time, when the mills on the river above Batavia were shut down so no water could run from above into the west mill pond at Batavia, run their establishment, using water from the mill pond, and thereby drew down said pond, so that in the morning following there was little, if any, water in said pond, and so that thereby the defendant was deprived of using any water from said pond that he was entitled to use, and that such use on the part of the plaintiff was an unreasonable one, under the principle laid down in the foregoing instructions, then the plaintiff had no right to complain if the defendant, as the water in the pond came in during the day, drew from the same through its race, provided the defendant used no more water thereby than it was then rightfully entitled to under the deed of April 1, 1857, from the Batavia Manufacturing Company to Levi Newton and the deed of April 12, 1862, from Fox River Manufacturing Company to Levi Newton."

Plaintiff contends that these last instructions are not pertinent; that if it had the right to preferred water, it could use it at all times of day and night, and that it was not required to hold it, even for a short time, until there would be a surplus above its preferred water to distribute with the defendant.

We can not assent to this position. If the use of the preferred water could not, under any circumstances, injure the rights of the defendant in the one-sixth of the surplus, there could be no objection to the plaintiff taking and using it without paying any regard to the defendant. But, unfortunately, the preferred and the surplus water compose a single

and entire body of water, unsevered and undistinguishable by mere observation. The preferred water can not be separated from the surplus, except when it is applied to use as motive power by the plaintiff, and since plaintiff is entitled to five-sixths of the surplus, *pro rata* with the defendant, as well as the preferred water, it is not required to nor does it appear that it was accustomed to distinguish accurately and constantly between that to which it was entitled as preferred, and that to which it was entitled as its *pro rata* part of the surplus.

It is manifest, therefore, in the very nature of things, that plaintiff, in taking its own, by improvidence or carelessness might materially injure the rights of the defendant. To maintain plaintiff's position requires the false assumption that the taking of a given quantity from a body of water, and applying it as motive power, involves no other or greater risk to the residue of the water, as motive power, than the taking of a given number of sticks of wood from a pile involves to that which is left. Water in a barrel or tank, designed to be consumed, might, undoubtedly, be thus divided; but it is to be observed, in this connection, as under the first point considered, that the rights of the parties here are not in the water itself, as an article of property, but only in its use as motive power, in the control and application of its momentum, as it flows.

Applying the doctrine of *Hadden* v. *Shoutz, supra,* it was proper that the court should take into consideration the evidence showing the location of the mill of plaintiff's grantor, below Newton's race, at the lower end of the pond, the custom of mill owners on that stream to shut down their gates at certain times to collect heads of water, and the compliance of appellant's grantor with that custom, at and before the contract with Newton. In the absence of express stipulations to the contrary, these circumstances are to be considered as having been assumed and accepted as regulating the time and manner of dividing and using the water; and if plaintiff's rights are thus limited, it is obvious that a failure to shut

down its gates during the usual times would give to it more water than that to which it is entitled, and injure the rights of the defendant by denying to it a portion of that to which it is entitled.   The defendant is entitled to draw from the heads of water, which all the circumstances show must have been within the contemplation of the parties when Newton's contract was made.

The fact that plaintiff's right is, that it shall have 600 inches of water, whether there is a residue or not, and that the defendant is entitled to only one-sixth of the water beyond that amount, upon no principle of law places it above the ordinary obligations of property-owners whose interests are equal.   It gives plaintiff no right to control, abridge, or in any manner infringe upon defendant's one-sixth in the residue.   It has a prior right in quantity, but, obviously, that must be enjoyed with reference to the posterior rights of others.   The difference, so far as affects the present question, is simply that between the owners of large and small interests in a common property.   Their rights are defined by the extent of their interests, but in the enjoyment of those rights they are entitled to an equal protection.

It is said in Washburne on Easements, page 266, § 26: "The mode and extent to which one mill owner may use and apply the waters of a stream, as between him and another mill owner, is not what would be reasonable for his particular business, but what is reasonable, having reference to the rights of the other proprietors on the stream, without, by such use, materially diminishing it in quantity or corrupting its quality. If one requires more than this, he can not claim it as a natural right.   The necessity of one man's business is not to be made the standard of another man's rights."

This doctrine is in accordance with the clearest conceptions of right, and abundantly sustained by adjudicated cases. *Davis* v. *Getchel*, 50 Maine, 602; *Merritt* v. *Brinkerhoff*, 17 Johns. 306; *Elliott* v. *Fitchburg R. R. Co.* 10 Cush. 195;

*Heeney* v. *Union Manf. Co.* 39 Conn. 576; *Wheatley* v. *Chrisman,* 24 Penn. St. 298.

This has reference, it is true, more immediately to cases where no superior rights are acquired by prescription or contract, but it is clear that in such cases the same principle must apply, except in so far as by prescription or contract superior rights are obtained, for the principle applies until thus modified or changed, and the change or modification must be limited to the prescription or contract. This is recognized in *Brace* v. *Yale,* 10 Allen, 441, where the plaintiff had a prescriptive right to the prior use of water.

Here, the contract declares that plaintiff is entitled to the use of a certain amount of preferred water. It does not specify how that use shall be enjoyed with reference to the rights of others. Had the parties stipulated that it might be enjoyed by a constant withdrawal of the water from the pond, or otherwise, the stipulation would control; but in the absence of such stipulation, the general principle that it must be a reasonable use, with reference to the rights of other parties interested in the use of the water, without regard to the special necessities of the plaintiff, is left to control. The question of what is a reasonable use of the water, is a question of fact, to be determined by the jury from the evidence. *Thomas* v. *Brackney,* 17 Barbour, 654; *Parker* v. *Hotchkiss,* 25 Conn. 321; *Wheatley* v. *Baugh,* 25 Penn. St. 535; *Davis* v. *Getchel, supra.*

A question is also raised upon the eighth instruction given at the instance of the defendant, which is as follows:

"The jury are instructed, that by and under the various deeds in evidence through which the plaintiff claims title from the original owners of the land and water power on the west side of Fox river at Batavia, and the deed from the Batavia Manufacturing Company to Levi Newton in evidence, it was the duty of the plaintiff to keep in repair the dam and other erections creating said water power so as to prevent

leakage to an unreasonable degree, as between the plaintiff and the defendant. If, therefore, the jury believe, from the evidence, that at the time when the plaintiff complains of the defendant in this case there was a material reduction in the quantity of water that would otherwise have been available at the mills in question by reason of material and unreasonable leaks in the dam or other erections creating said water power, then the amount of such material reduction, if any, as it existed from time to time, the jury are instructed, should not be deducted from the amount of water to which the defendant was otherwise entitled, according to the other instructions given by the court to the jury in this case. And the jury are further instructed that the defendant can not be held liable in this case for drawing, from time to time, the amount of water they would lawfully have enjoyed if the volume of available water had not been reduced by such material and unreasonable leakage, if any such material and unreasonable leakage is shown by the evidence to have existed."

It will be remembered that the deed of House & Barker to Van Nortwick contains this covenant:

"And the said party of the first part, for themselves, their heirs and assigns, do hereby covenant, promise and agree to and with the said party of the second part, his heirs and assigns, to ever maintain and keep in repair a dam across said river, on the stile of the present dam at Batavia, and at the same height, and in case they should neglect to do so, then the said party of the second part, his heirs and assigns, after due notice being given, may repair or build said dam, the cost of which shall be paid by the said party of the second part, their heirs or assigns."

And the deed of Van Nortwick to the Batavia Manufacturing Company contains this grant:

" The said first party also conveying to said second party the benefits and rights accruing to him or his assigns from the obligations of other owners of water power on the east side of

the river to keep up and maintain the dam across said river, the said second party being obligated to keep up and maintain the racks connected therewith on the west side of said river."

And these rights passed by the successive grants to the plaintiff.

The covenant of House & Barker to keep the dam in repair is one running with the land, and an action may, therefore, be maintained thereon by the plaintiff. *Woodruff* v. *Trenton Water Power Co.* 2 Stockton's Ch. 489; *Sharp* v. *Waterhouse,* 7 Ellis & Blackburn, 816; *Thompson* v. *Shattuck,* 2 Metc. 615; Angell on Watercourses (6 ed.) sec. 258; and the plaintiff is also authorized, by the alternative clause in the covenant, to enter upon and make the repairs itself.

The grant to Newton is to draw through his raceway one-sixth of the water, above the 600 inches preferred, that can or may be obtained, and his covenant binds him " to pay one-twelfth part of all the costs and expenses to which the company may be liable or may incur from time to time in improving or elevating or repairing the dam over Fox river or the embankment at the south end of the pond, as may be by them deemed expedient and necessary in securing and maintaining the water."

The proper conclusion is, it was intended the dam was to be kept in such state of repair as was reasonably necessary to secure the water power, and the burden of doing this was upon the Batavia Manufacturing Company and has passed to the plaintiff,—Levi Newton and his grantee being bound to contribute one-twelfth of the expense therefor. No right is conveyed to Levi Newton to enter upon the dam, or upon the premises of the Batavia Manufacturing Company for the purpose of making repairs, and without such a right he could not make the repairs. The Batavia Manufacturing Company and its grantees have that right, and the reasonable implication from the grant of a surplus is, that the grantor shall preserve a surplus or make reasonable efforts to that end, upon which the grant can take effect.

We agree with the court below that if the plaintiff permitted water to escape through the dam, which, by the exercise of reasonable care, it could have detained for use, the loss must fall upon it, and can not be charged against the defendant; and we see no substantial objection to the instructions in that respect.

The objection that the court refused to allow the plaintiff to read in evidence the deed of Levi Newton to the defendant, is frivolous. Defendant's title, traced through that deed, was admitted by stipulation of the parties. There was no controversy about it. The deed itself could prove no fact that was not already proved. Its terms in nowise change or affect the construction we place upon the instruments which fix the extent and character of the rights of the respective parties.

The only remaining point is, does the evidence sustain the verdict. Upon this we do not deem it important to spend much time. The only period during which it is claimed there was a diversion of water, was during the months of July, August and September of the year A. D. 1874. The season was unusually dry, and, during the greater portion, if not all of this period, the quantity of water in Fox river was inadequate to the entire demands of the manufacturing interests dependent upon it.

There are dams on this river at Geneva, two and a half miles above, and at St. Charles, five miles above Batavia, at which the mill owners were accustomed to shut down their gates, during this period, at any early hour in the evening, and keep them down through the night, and thus cut off all flow of water from above except that which escaped by leakage, and this seems to have been in conformity with a well established custom. This necessitated a like practice at Batavia to secure full heads of water for operations during the day. The evidence strongly tends to show that this custom was observed by the defendant, but disregarded by the plaintiff, and that by running of nights when the gates of other mills were shut down, it not only frequently drew the water to

which it was entitled, but also drew off much of that in the use of which defendant was entitled to participate. There is, also, evidence tending to show that plaintiff, through failure in keeping the dam in a proper state of repair, suffered a large quantity of water to escape by leakage, and thus also diminished that in the use of which defendant was entitled to participate.

There was evidence, on behalf of plaintiff, showing that defendant had, during this period, deepened its race, in order to draw more water than it would have drawn through its race as constructed by Newton. This, however, we think, was fairly answered and overborne by evidence of defendant showing that what plaintiff's witnesses supposed was a deepening of the race, was, in truth, only a removing of sediment deposited at the head of the race by the flow of the water, and that it was not deepened, if, indeed, it had the same depth it had when the grant was made to Newton. The evidence tended to show that plaintiff, by the location of its mill and the construction of its race, had two feet in the advantage of the flow of water over the defendant, and that by running of nights and the improper leakage it suffered in the dam, it deprived defendant of participation in water to an equal or greater amount than that of the preferred water to which plaintiff was entitled.

The conflicting questions of fact were proper questions for the consideration of the jury. Plaintiff was only entitled to a recovery for a diversion by the defendant prejudicial to its right to a reasonable use of the water, in view of the rights of all others having interests in its use, and must itself bear all losses chargeable to its own unreasonable use of the water under the existing condition of things; and we do not feel authorized to say the preponderance of the evidence clearly and palpably is with the plaintiff on the issues before the jury.

The judgment is affirmed.

*Judgment affirmed.*