C. W. Gates v. Settlers' Milling, Canal & Reservoir Company, Richard Maphet, Jacob Wolf, and H. G. Drake.

(Filed September 4, 1907.)

(91 Pac. 856.)

1. **WATERS AND WATER COURSES—Irrigation—Prior Right—How Secured.** The right to the use of water from a public stream for irrigation purposes depends upon the construction of appropriate ditches, the conducting of water through such ditches to the place of intended application, and the application of such water to beneficial uses, all within a reasonable time; and he has the best right who is first in time.

2. **APPEAL—Review—Findings of Court—Sufficiency of Evidence.** Where the questions of priority of right to divert water from a running stream for the purposes of irrigation, and the question as to whether either of the claimants has used reasonable diligence in prosecuting his work and in making application to beneficial uses of the water, are controverted questions of fact dependent upon the weight of contradictory testimony and the credibility of witnesses, this court will not disturb the finding of the trial court, if there is competent evidence reasonably tending to support the finding and judgment.

3. **WATERS AND WATER COURSES—Priority of Water Rights—Distribution of Supply.** Where there are conflicting claims for priority in the use of water rights for irrigation purposes, the

court, in an application for injunction, may make equitable distribution of the supply of water according to the priority of claimants and the quantity each has by his labor and diligence acquired the right to divert.

4. **APPEAL—Review—Conflicting Evidence.** Where a question depends upon the weight of the evidence for its determination, and the evidence is conflicting, or of a vague and uncertain character, the appellate court will not review such questions.

(Syllabus by the Court.)

*Error from the District Court of Woodward County; before John L. Pancoast, Trial Judge.*

Affirmed.

*Stanley & Stanley, D. P. Marum,* and *Stanley, Vermillion & Evans,* for plaintiff in error.

*F. C. Price* and *Charles Swindall,* for defendants in error.

Opinion of the court by

BURFORD, C. J.: This action involves the question of priority of right to divert water from the Cimarron river for irrigation purposes. Oklahoma has not so far been credited to the arid belt, and agriculture has been successfully conducted by the aid of nature's supply of moisture; but in some localities, in the higher altitudes pertaining to the extreme western counties of the territory, irrigation upon a small scale has been profitably resorted to, and an increasing public interest is being developed in not only the expediency, but the necessity, for extensive irrigation of agricultural and meadow lands in the fertile valleys of western Oklahoma. In the year 1897 our legislature passed an irrigation act. (1 Wilson's Rev. & Ann. St. 1903, p. 814, c. 44, §§ 3282-3304). This statute was repealed in 1905, and a more comprehensive law substituted, which is still in force. (Laws 1905, p. 274, c. 21, art. 1.) It is conceded that neither of the parties to this litigation proceeded under either of these statutes; but both, as we understand the case, base their claims upon the general rule of law applicable to such cases. Yet, if any rights were acquired and be-

came vested under the statute of 1897, the statutory provisions must control as to such rights.

It appears from the record that the plaintiff in error, Gates, commenced his suit in the district court of Woodward county against the Settlers' Milling, Canal & Reservoir Company, on November 6, 1903, to enjoin the defendants from diverting water from the Cimarron river, on the ground that such diversion was a material interference with a prior right acquired by him to the use of the water for irrigation purposes. Gates bases his claim of priority upon an appropriation made by J. H. Williamson, through a ditch constructed in the early part of the year 1901, which was about three miles in length and took the water from the river about two miles below the point where the defendant's ditch connected with the river. Williamson sold his land and ditch and his water rights to Gates in July, 1902. A portion of the flow of water in the Cimarron river was actually appropriated to beneficial uses for agricultural purposes during the years 1901 and 1902. The irrigating ditch used by the defendants, which is made the subject-matter of this controversy, was commenced about the year 1902, and has its headgate above the point where the plaintiff procures his water supply. But it is contended that this ditch is but a continuation and change of work begun in 1896 and continuously carried on until the time of the bringing of this suit. The Settlers' Milling, Canal & Reservoir Company was incorporated under the laws of the territory of Oklahoma on June 4, 1895, for the purpose, as shown by its articles of incorporation, of "constructing a ditch to convey water to lands to be used for milling purposes, or for the purpose of irrigation of farming lands." The stockholders and officers of this company were farmers and land owners whose lands were to be benefited by the irrigation project, and the capital stock paid in consisted almost entirely of the work done by the individual stockholders in constructing the ditch, dam, flumes, and other necessary work in repairing the same. The year the company was incorporated it

did some work in repairing and strengthening a dam in the Cimarron river which had been partially constructed and used by Mr. Maphet, one of the stockholders and the president of the company. About 150 loads of stone were hauled and dumped into the riverbed to strengthen the old dam. The purpose of the company was to divert the water from this point and make use of the old Maphet ditch, which it seems the corporation succeeded to by common consent. In the spring of 1896 100 loads more of stone were put in to support the old dam. Later on in the year a break occurred in the dam, and piling was driven in and supported by more stone put in for that purpose. The dam was completed across the river, 225 feet in length. Owing to frequent rises in the river that year, heavy timbers and sod were used to strengthen and repair the work, which was completed at an estimated cost of $2,000. This improvement was a distance of twelve miles from a railway station, in a sparsely settled country, and forty miles from where some of the timbers and piling had to be obtained and hauled. The company also caused a survey to be made from the old Maphet headgate, along the old Maphet ditch, in an easterly course a short distance, and thence continuing east to Horse creek, where it was necessary to construct a flume to carry the water across this creek. The old ditch was cleaned out, and a new portion constructed and completed, a distance of one mile, from the old headgate to Horse creek. In the spring of 1897 work was begun upon the flume, which was constructed by driving three rows of cedar piling into the ground from 8 to 11 feet, upon which was built of lumber an aqueduct 100 feet long and 16 inches deep to carry the water over the creek. The ditch was extended another half mile beyond this flume, and a full head of water turned in and conducted through the flume and into the laterals, carrying the water to the farms of T. C. Maphet and G. C. Maphet, and by them applied to about 40 acres of land and crops. The company also in 1897 applied to the secretary of the interior for reservoir and right of way privileges over the public lands, which

application was granted and confirmed. It also gave notice, under the provisions of the statute of 1897, of its intention to appropriate water, which notice was recorded in the office of the register of deeds for Beaver county.

During the year 1898 water was flowing through this ditch and flume until April or May, when a flood in Horse creek swept the flume away and carried it down the river. Instead of rebuilding the flume, the ditch was extended up the west side of Horse creek one-fourth of a mile to a point where the ditch and bed of the creek were on the same grade, and the water was conducted across the bed of the stream, by throwing up a sand barrier, and back down the east side of the stream, through a new ditch, until it again connected with the old ditch, and was applied during the season to crops east of Horse creek, consisting of sixty acres of. kaffir and forty acres of wheat. The ditch and levees across Horse creek were washed out and repaired a number of times during the season of 1898. In 1899 the levee across Horse creek was rebuilt, and the water was applied to 70 acres of land, some of which was meadow. A rise in the river wrecked one end of the dam, and it was repaired by putting in rock and piling. In 1900 the ditch was completed to Red Bluff, making 3 1-3 miles of ditch built by the defendant company, and 130 acres prepared for crop, which it was the purpose to irrigate, and water was applied to 100 acres. On April 8, 1900, an unprecedented rise in the river caused it to cut a new channel, running straight across and cutting off the Horseshoe bend, and leaving the diversion improvements of the Settlers' company a mile south of the new channel, and completely. cutting off its water supply. An attempt was made by the company to turn the river back into its old channel by damming the cutoff, and about 400 loads of stone, sand, brush, and other obstructions were placed in the channels, without beneficial results. It was then found necessary to go farther up the river, and divert the water at a new point, and construct a new ditch to a connection with the old ditch at the old

headgate. and this was done and the water turned into it. It was then discovered that the channel of the river had cut below the bed of the ditch, and the water would not rise high enough to flow through the old ditch. The next year, 1901, the extension ditch was deepened and the water carried to the old headgate, across Horse creek by the sand levee, and applied to a small area of land. This raised the sheet water so as to produce subirrigation for 130 acres of crops and 70 acres of grass land. The river channel at the cutoff continued to deepen, and the sand dam washed out, and the ditch filled with sand for several rods before the next season, and after repeated efforts to overcome the difficulties, it was determined to abandon this scheme and adopt a new point of diversion and scheme of distribution. In the spring of 1902 the company selected a new point of diversion, where Horse creek empties into the Cimarron, and constructed a ditch from this point to a connection with the old ditch between there and Red Bluff, and paralleled it into the valley designed to be irrigated. This new route reached practically the same territory to be irrigated, ran in the old channel a portion of the way, and followed the old right of way for some distance. The work made good progress, and at the time of the trial about 8 miles of ditch and laterals were completed, and several hundred acres of land were receiving water. This last improvement is the one attacked by plaintiff's petition. At the time this new route was adopted and the new work done the plaintiff had appropriated a portion of the flow of the river for his uses, and the priorities of the contesting claimants is the sole question for determination. The cause was tried to the court without the intervention of a jury, and a decree entered making an equitable distribution of the water according to the amount that each had actually appropriated for beneficial uses, as shown by the evidence and as found by the court, at the time the suit was instituted. The court made a general finding upon which the decree was based.

It is contended that the court found certain facts specially,

and we are asked to apply the law to these findings. A close inspection of the record fails to disclose that any request was ever made by either party for a special finding of fact, and in the absence of such request the finding of the court, however full and complete, amounts to no more than a general finding. 8 Enc. Pl. & Pr. 933-935; *Conner et al. v. Town of Marion,* 112 Ind. 517, 14 N. E. 488; *Caress v. Foster,* 62 Ind. 145; *Bake v. Smiley,* 84 Ind. 212. Nor will the incorporation of the oral opinion of the court into the case-made give it any special significance; and this court will only look to the record as embraced in the entry upon the journal. This question was specifically decided in *Guss v. Nelson,* 14 Okla. 296, 78 Pac. 172.

The ditch of the plaintiff was begun in January, 1901, and carried on to completion in May, 1901, when the water was conducted through the ditches and water actually applied to the irrigation of cultivated lands. It seems the settled law in the states where irrigation problems have been dealt with that, in order to acquire a vested right in the use of water for such purposes from the public streams, three things must concur: There must be the construction of ditches or channels for carrying the water; the water must be diverted into the artificial channels, and carried through them to the place to be used; and it must be actually applied to beneficial uses, and he has the best right who is first in time. The plaintiff in error contends, first, that the defendants' present place of diversion and location of its ditch is not a continuation of the former works, and that its right of appropriation must be confined to the time of the construction of its last diversion works and appropriation; and, secondly, that, if the last work done is a continuation of the former efforts, the work was not carried on with such diligence as to warrant its claim of priority. There seems to be no serious difficulty in determining the law on these questions; but the difficulty, if any, lies in the application of the law to the facts. The law requires that there must be reasonable diligence by one intending to appropriate water from

a stream, both in the prosecution of the improvements necessary to conduct the water to the place of use and in the application of the water to beneficial uses. *Moss v. Rose* (Or.) 41 Pac. 666; *Arnold v. Passavant* (Mont.) 49 Pac. 400; *Conaut v. Jones* (Idaho) 32 Pac. 250; *Senior v. Anderson* (Cal.) 47 Pac. 454; *Elliott v. Whitmore* (Utah) 65 Pac. 73; *Hall v. Blackman* (Idaho) 68 Pac. 21; Gould on Waters, sec. 226 to 239; Long on Irrigation, sec. 47; *Ft. Morgan Land Co. v. South Platte Ditch Co.,* 18 Colo. 1, 30 Pac. 1032; *Becker v. Marble Creek Co.* (Utah) 49 Pac. 893; Kinney on Irrigation, sec. 164; *Union Mill & Mining Co. v. Dangberg* (C. C.) 81 Fed. 75. And a failure to use due diligence will be treated as an abandonment as against a subsequent appropriator whose right has attached pending the completion of the first appropriator's right.

But both questions of fact contended for by plaintiff in error were determined against him by the trial court. There was a large number of witnesses examined, and some of the testimony is of a vague and uncertain character, while some is contradictory; but there is competent evidence reasonably tending to support the finding and judgment of the court. Practically all the evidence introduced was upon the question of the work done each year by the defendant Settlers' company and its predecessors in their efforts to successfully conduct the water from the Cimarron river through the various channels and flumes constructed across Horse creek, and the number of acres of agricultural land it was applied to each year, covering a period of seven or eight year. It appeared from the testimony of these witnesses that the Cimarron river was a sandy, treacherous stream, in which it was difficult to construct a dam or barrier which would serve to turn the water into the irrigation ditches; that in the spring of each year the rises in the river would fill the ditches with sand and destroy the dams, flumes, and other improvements; that the timber, lumber, and materials for piling, dams, and flumes had to be transported with teams long distances; and that the work had to be done by farmers

and settlers, who could only give part of their time to this work. It was also shown that the river changed its channel and left the diversion works a mile or more from the new channel, effectually cutting off the supply of water and making it necessary to survey and construct another connection with the river at a new point of diversion; and each year the company or its members were making repairs on the old, or constructing new, works to enable them to utilize the water supply. Reasonable diligence was required of them. As to what constitutes reasonable diligence must be governed by the circumstances of each particular case, and necessarily varies with each particular case. It is a question of fact, and must be determined from all the evidence in the case. The trial court heard this evidence and found, for the defendant company, that it was the prior appropriator of the water to the amount and extent it had actually applied to beneficial uses at the time the plaintiff made his appropriation, and gave to the plaintiff the right, after this quantity was taken by the defendant, to take an amount equal to the quantity beneficially applied by it, after which the defendant's right would again attach to any excess. We cannot disturb this action of the trial court. It has become the settled rule of this court that the finding of a court upon the facts will be treated the same as the verdict of a jury, and, where there is competent evidence reasonably tending to support the verdict or finding, this court will not weigh the evidence or attempt to determine the preponderance, but will affirm the action of the trial court.

There are other questions argued in the briefs, but each of them depends upon the weight of the evidence, and we cannot review them.

The judgment of the district court of Woodward county is affirmed, at the costs of the plaintiff in error.

Pancoast, J., who presided in the court below, not sitting; Irwin, J., absent; all the other Justices concurring.