## ROGERS et al. v. HARRIS.

No. 9035. Opinion Filed Oct. 21, 1919.

(Syllabus by the Court.)

### 1. Fraud—Misrepresentation—Intent.

In an action for fraud predicated on a promise to be performed in the future, the

gist of the fraud is not the breach of the promise, but the fraudulent intent of the promisor at the time of making the promise not to perform the same, and the intent to deceive the promisee by such false promise. To render non-performance fraudulent the intention not to perform must exist when the promise is made, and if the promise is made in good faith when the contract is entered into, there is no fraud although the promisor subsequently changes his mind and fails or refuses to perform.

### 2. Judgment—Findings—Opinion of Trial Court—Effect on Appeal.

The opinion of the trial court, delivered in announcing judgment, does not constitute findings of fact, as contemplated under section 5017, Rev. Laws 1910, and may not be considered as such, or to vary the judgment of the court as contained in the journal entry. But when properly incorporated in the case-made, it may be considered in determining the correctness of the conclusion on which the judgment is based.

### 3. Fraud—Evidence—Burden of Proof.

Ordinarily where an action is predicated on fraud in the procuring of a written instrument, the proof must sustain the allegations by a preponderance so great as to overcome all opposing evidence and repel all opposing presumptions of good faith.

### 4. Oil and Gas—Sale—Property Included—Payment.

C. purchased the interest of H. in certain oil lands and leases, in the possession and under the management of C., including cash on hand and credit due H. A check previously issued and delivered to R., a joint payee, in payment of credits due H. and R., but not delivered to H. and of which he had no actual notice, was recalled from R. and canceled, treating the amount represented by the check as cash on hand. Held: The sale included cash on hand as shown by credits due and unpaid, delivery of the check to R. in the circumstances of this case amounted to payment, and H's interest in the check was not included in the sale.

### 5. Same—Appeal and Error—Evidence.

This cause being one of purely equitable cognizance, the evidence reviewed, and held: the judgment of the trial court is clearly against the weight of evidence.

Error from Superior Court, Tulsa County; M. A. Breckenridge, Judge.

Action by Vernon V. Harris against Harry H. Rogers, James A. Chapman, and the McMan Oil Company, to cancel conveyances of certain lands and oil leases conveyed by him to the Oil Company, and by the Oil Company to Rogers. Judgment for plaintiff and defendants appeal. Reversed and remanded.

West, Sherman, Davidson & Moore, Cottingham & Hayes, and Burford, Miley, Hoffman & Buford, for plaintiffs in error.

H. B. Martin, A. F. Moss, and Stuart, Cruce & Cruce, for defendant in error.

OWEN, C. J. Harris alleges Chapman and Rogers conspired together to defraud him of his interest in partnership property, with the intention of purchasing same for Rogers, and that Rogers induced him to sell his interest for an inadequate consideration, by falsely representing that he, Rogers, was selling for a like amount, and by concealing the real value of the property.

Chapman denies he conspired with Rogers or practiced any fraud on Harris, or purchased his interest for the use and benefit of Rogers. He alleges he purchased the Harris interest in good faith for the McMan Oil Company, and that the sale to Rogers was an independent, bona fide transaction, subsequent to the purchase from Harris.

Rogers denies he concealed or fraudulently misrepresented the value of the property, or conspired with Chapman, or in any manner practiced fraud on Harris. He alleges he acquired the Harris interest subsequent to the conveyance of same to the McMan Oil Company as a separate and independent transaction, without intent to defraud Harris.

The salient facts appear to be that Harris and Rogers formed a partnership during the year 1907 to practice law, with offices at Holdenville and Wewoka, and as partners acquired certain tracts of real estate and oil leases. Rogers accepted employment with the McMan Oil Company, and removed to Tulsa in January, 1913. It was agreed that Harris would continue to look after the joint interests of the firm during the year, 1913, Rogers to pay him a portion of the salary received from the Oil Company. Rogers, under the terms of his contract, was to have an opportunity to acquire such interest as he might desire to take in properties acquired by the Oil Company, and it was agreed between Rogers and Harris that Harris would share these interests with Rogers. This relation continued until October, 1914, when Rogers and Harris agreed to dissolve the partnership and divide their holdings. A division was made of some of their properties, but it was found impractical to divide all holdings and no settlement was made of the lands and leases involved in this action.

In the development of the properties involved, the interest owned by Harris and Rogers was charged with a proportionate cost of development and credited with a proportionate share of profits. These profits were paid when the oil was sold by the Oil

Company, payments being made to Rogers, and he, in turn, paying one-half to Harris.

About the 5th of August, 1915, the McMan Oil Company made a proposition to Harris to purchase his interest, offering $60,000. Harris wanted $100,000. Negotiations were carried on until about September 9th, when Harris offered to sell for $80,000. In the meantime he had received a dividend of $7,500. This offer was accepted and this amount paid by Chapman acting for the McMan Oil Company.

Harris understood he was selling his entire interest, including cash on hand and credits due him from the Harris and Rogers interest, for the sum of $80,000, but claims he understood from Rogers that he would sell for a like amount and that the credit due the partnership interest was about $15,000, when in truth and in fact Rogers did not sell and the credit was something over $30,000.

It appears Harris is a bookkeeper and an expert accountant, formerly engaged in the banking business, and kept the books of the Rogers and Harris partnership, receiving monthly statements of the amount of oil to the credit of this interest. By mere calculation he could have ascertained the exact amount due. The statements were something like two months behind, but no effort was made by Harris to ascertain the exact amount; no contention is made that he was ever denied or refused a statement of the amount on hand to the credit of his interest. It appears Rogers guessed the credit to be about $15,000. Harris said at that time he thought it was probably $20,000 to $25,000.

Counsel contend that Chapman and Rogers conspired together to defraud Harris by inducing him to sell for an inadequate consideration and that the sale to the Oil Company was a mere subterfuge for the use and benefit of Rogers, and in this connection insist that Harris would not have agreed to sell for $80,000 had he known the property had earned a credit of more than $30,000. This contention is not supported by the evidence. The evidence is to the effect that Harris had considerable experience in dealing in oil lands and leases in which Rogers had no interest. A representative of the McMan Oil Company purchased some of these leases from him about the 5th of August, 1915, and at that time made the offer of $60,000 for his interest in the property in controversy. Rogers was then in California, and there is no proof or intimation that he inspired the offer or had any knowledge concerning it. Harris at that time offered to take $100,000,

according to his own testimony. The testimony of witness Barnard is that he offered to take $80,000, but later, the price of oil having increased, stated he did not believe he would take $80,000, wanted $100,000, but said he would talk to Rogers about it. On Rogers' return to the state Harris went to Tulsa and while there received $7,500 from Rogers as profits from their joint interest. Harris consulted him concerning the offer he had received and Rogers stated he would like to sell his interest and get out of the oil business and would be willing to sell for $80,000. Harris a few days later authorized Rogers to submit a proposition to Chapman to sell Harris' interest for $80,000. Rogers complied with the request and Chapman, acting for the company, accepted the offer on September 9th, Rogers communicated this fact to Harris over the telephone and it was agreed that Harris would write Chapman a letter setting out the contract as he understood it. On that date Harris wrote a letter to Chapman in which he stated:

"I made a verbal proposition to you through Harry, to sell my interest in all oil leases, and land in Creek county, in which you or the McMan Oil Company are interested, for the consideration of $80,000, to be paid cash, and Harry reported that you had accepted the offer. I write this letter to put the offer in writing. I think it well to refer specifically to the tracts of land, an interest in which I understand I am offering you."

(After describing the land it was further stated:)

"You are to assume all obligations that I may have for my part of drilling operations on the land, or leases or anything of the kind. You are to have all oil, accounts, notes, cash now on hand from leases above mentioned."

Counsel contend that Harris, reposing great confidence in the judgment of Rogers as to values, agreed to sell only because he believed Rogers was selling, and that because Rogers did not sell, this amounted to fraud and was sufficient to vitiate the entire transaction.

Harris appears to have been uncertain whether the offer of $80,000 was a good proposition, and to have been influenced to some extent by the apparent willingness of Rogers to accept a like amount for his interest. But the evidence does not support the contention that Rogers fraudulently represented he was selling and that Harris would not have sold, but for such false representations. On the contrary the proof is that Rogers was willing to sell his interest for $80,000.

At the time Rogers advised Chapman of

Harris' offer to sell for $80,000, he told Chapman he would like to sell his interest for a like amount, but Chapman, desiring to retain his services as attorney for the company, persuaded him not to sell, and as an inducement to remain with the company, suggested to him they would increase his interest and share of the profits by selling him the Harris interest on a credit. As a result of such negotiations, Rogers decided to remain with the company and to purchase the Harris interest. Therefore, the rule relied upon which will vitiate the sale where one partner is induced to sell by reason of false and fraudulent promises and representations made by the other partner has no application. It was said by this court in the case of McLean v. S. W. Casualty Ins. Co., 61 Oklahoma, 159 Pac. 660:

"There is a wide distinction between the non-performance of a promise and a promise made mala fide, and without any intention at the time of making it to perform it."

The gist of the fraud in such instances is not the breach of the promise, but the fraudulent intent of the promisor at the time of making the promise not to perform the same, and the intent to deceive the promisee by such false promise. To render non-performance fraudulent the intention not to perform must exist when the promise is made, and if the promise is made in good faith when the contract is entered into there is no fraud, although the promisor subsequently changes his mind and fails or refuses to perform. 12 R. C. L. 262. When the offer of $60,000 was made to Harris about the 5th of August, and while Rogers was in California, there was no intimation that Rogers was selling his interest. At the time Harris talked it over with Rogers he received a payment of $7,500, and when he agreed to accept $80,000 for his interest, he was getting within $12,500 of the price at which he had been willing to sell, according to his own testimony. Assuming he was influenced by Rogers' manifest willingness to sell for $80,000, it falls far short of proving such false promise, or inadequacy of consideration, as to amount to fraud. As has been pointed out, Harris was not without experience in buying and selling off leases, and the fact that he received a sum of $12,500 less than the amount for which he first offered to sell, does not furnish sufficient reason for cancelling his sale to the oil company, which the trial court found was a bona fide transaction, not for the benefit of Rogers.

The fact that the price of oil continued to advance and the enterprise proved profitable to the Oil Company does not amount to fraud, and furnishes no ground for cancellation of the conveyances. Chapman and Rogers had no means of knowing the price of oil would continue to advance. The properties when developed proved of great value, but neither the advance in price of oil nor the value of the properties after development is to be considered in estimating the value at the date of the sale, and in determining whether fraud was practiced so as to vitiate the transaction. These circumstances have no tendency to establish fraud. In the case of Sullivan v. Pierce, 125 Fed. 104, it was said:

"It requires conscious effort, when we attempt to estimate the value of the property at the date of the sale, to exclude from our minds the effect of the great increase in value immediately following the sale. * * * The great advance in values made the complainant regret his sale, and probably sharpened his wits to discover badges of fraud."

In the case of Geddes' Appeal, 80 Pa. St. 461, where the facts were not dissimilar to the facts presented by this record, it was said:

"That the business was prosperous, enabling the parties to make large profits, and to pay for the shares out of the profits, is not to the purpose. We are not to judge in this transaction by the light of subsequent events. It was consummated in the face of an uncertain future. The ebb and flow of the business tide in that future was concealed from human vision."

In announcing judgment the trial court delivered an oral opinion, which was transcribed by the reporter and without objection incorporated in the case-made, from which it appears the court concluded from the evidence that Chapman acted in good faith in purchasing Harris' interest for the McMan Oil Company, and that this sale was a bona fide transaction without notice. He also concluded that Rogers wanted to sell his interest, but was persuaded by Chapman not to do so, and subsequently purchased the Harris interest. The evidence supports these conclusions.

The opinion of the trial court does not constitute findings of fact, as contemplated under section 5017, Rev. Laws 1910, and may not be considered as such, or to vary the judgment of the court as contained in the journal entry. James v. Coleman, 64 Oklahoma, 166 Pac. 210. But it may be considered in determining the correctness of the conclusions on which the judgment was based.

Expressions of the trial court in rendering judgment have been considered repeatedly for that purpose. C., R. I. & P. R. Co. v.

Warren, 63 Oklahoma, 163 Pac. 705; Hennessey Oil & Gas Co. v. Neely, 62 Oklahoma, 162 Pac. 214; Rison v. Harris, 50 Okla. 764, 151 Pac. 584. In the case of James v. Williams, 31 Cal. 213, it was said:

"The opinion of the judge who tried the cause, stating the evidence or his analysis of it, or some portion of either, coupled with the reasons for his rulings, is always valuable."

And in the case of Spoon v. Sheldon (Cal.) 151 Pac. 150, it was said:

"While the written opinion of the trial court, though contained in the transcript, is no part of the record and cannot perform the office of findings, the appellate court may look to it to ascertain the considerations arising from evidence in the record which influenced the trial judge in his decision."

In Miller v. Marks, 148 Pac. 412, the Supreme Court of Utah said:

"Where the opinion of the trial court is settled in the bill of exceptions, and made a part of the record, the court on appeal may look to it, to ascertain the trial court's reason for its decision."

Notwithstanding the opinion of the trial court was that the sale from Harris to the McMan Oil Company was a bona fide transaction without notice, the judgment rendered was that this sale and the sale from the Oil Company to Rogers be set aside, the conveyances canceled, and Rogers and the Oil Company held as trustees.

The action was predicated on fraud and aimed primarily at the cancellation of the sale to the McMan Oil Company, alleging this sale was fraudulent and a mere subterfuge for Rogers' benefit. To sustain this allegation the burden was on plaintiff to prove fraud. In the case of Owen v. U. S. Surety Co., 38 Okla. 123, 131 Pac. 1091, Mr. Justice Kane, speaking for the court, said:

"In this jurisdiction, where fraud is alleged in the procuring of a written instrument, the proof must sustain the allegations by preponderance of evidence so great as to overcome all opposing evidence and repel all opposing presumptions of good faith."

To the same effect are the cases: Moore v. Adams, 26 Okla. 48, 108 Pac. 392; Limerick v. Jefferson Life Ins. Co., 67 Oklahoma, 169 Pac. 1080.

This is the applicable rule to the issues and theory on which the case was tried. The rule urged by counsel relating to partnership transactions, where one partner purchases from another, requiring the purchasing partner to prove the utmost good faith and fair dealing, has no application for the reason the proof is, as the trial court found,

the sale was not to Rogers or for his benefit. Harris alleged and undertook to prove that Chapman and Rogers conspired together to defraud him and by false and fraudulent representations induced him to sell to the McMan Oil Company, and that this sale was a mere subterfuge, not made for the use and benefit of the Oil Company, but for the use and benefit of Rogers. Had the proof sustained this allegation the rule urged would apply, but the weight of evidence is against this contention and supports the conclusion of the trial court that this purchase was not made for the use and benefit of Rogers, but in good faith for the McMan Oil Company. The allegations of fraud against the sale to the company having failed, it necessarily fails against the subsequent sale from the Oil Company to Rogers.

When the trial court reached the conclusion that the evidence did not support the allegations and theory of plaintiff, but on the contrary did support the contentions made by defendants,—that is, that the sale to the McMan Oil Company was a bona fide transaction, without fraud, for the use and benefit of the Oil Company; that Rogers, at the time he talked with Harris, was, in fact, willing to sell his interest for a like sum, but was afterward persuaded not to do so, and subsequently purchased the Harris interest as an independent transaction—judgment should have been for Rogers.

The judgment appears to have been based on the transaction in which a check for $30,000 was returned to the McMan Oil Company. This check was issued September 2d and was delivered to Rogers in payment of that amount of the credit due the Harris and Rogers interests. When the sale was consummated by the acceptance of Harris' offer on September 9th, this check was still in Rogers' possession, and Harris had not been advised of it. Chapman treated this check as cash on hand and canceled it. The trial court concluded from the evidence that no intentional fraud was practiced on Harris by either Chapman or Rogers in this transaction. The weight of the evidence supports this conclusion. We concur also in the conclusion of the trial court that this check ought not to have been returned to Chapman and cancelled. It ought not to have been treated as cash on hand without calling it to Harris' attention. He understood that he was selling and Chapman understood he was purchasing the cash on hand and unpaid credits as of September 9th. None of the parties appear to have been particular in ascertaining the exact amount of credit due at that time. The practice had been, how-

ever, to issue checks and deliver them to Rogers, he, in turn, paying Harris the one-half due him. Chapman was familiar with this practice and when he accepted Harris' offer on September 9th, he was chargeable with notice that this check had been issued and delivered to the payees. Therefore the offer and acceptance did not properly include $15,000, one-half of the check which was due Harris, and this amount should have been paid to Harris and not treated as cash on hand. While it is true the check itself did not operate as an assignment of the funds so as to bind the bank on which it was drawn (section 4239, Rev. Laws 1910), its issuance and delivery, in view of the circumstances in this case, as between the drawer and payee, should have been treated as an assignment and in payment of the credit due the Harris and Rogers interests. There was no such meeting of the minds of Harris and Chapman concerning this item as to include it among the assets in the contract of sale. But the circumstances do not amount to fraud and are not sufficient to vitiate the entire sale and warrant the cancellation of the conveyances.

The action being one of purely equitable cognizance, this court must consider and weigh the evidence, and having done so, it is our opinion the judgment of the trial court is clearly against the weight of the evidence. The judgment of the lower court should have been for plaintiff against the defendant McMan Oil Company for $15,000, with interest from September 9, 1915.

The judgment is reversed and cause remanded (section 5258, Rev. Laws 1910) with directions to enter judgment for the plaintiff against the defendant McMan Oil Company for $15,000, with lawful interest from September 9, 1915.

KANE, J., concurs in reversing the judgment, but takes the view the cause should be remanded for a new trial.

RAINEY and McNEILL, JJ., did not participate in the consideration.

The other Justices concur.