## FORBES v. BECKER.

No. 19899. Opinion Filed May 26, 1931.

Rehearing Denied July 28, 1931.

Wallace & Wallace and Streeter Speakman, for plaintiff in error.

Hughes & Ellinghausen and Hagan & Gavin, for defendant in error.

SWINDALL, J.  This was an action to set aside a partnership settlement on the ground of fraud; for an accounting; and to recover an undivided one-half interest of an undivided one-fourth interest in an oil and gas lease known as the Miller Tiger lease, on a claim that the one-fourth interest was a partnership asset.

It was undisputed that on September 27, 1925, the parties, Mr. Becker and Mr. Forbes, formed a partnership as drillers for oil and gas, in which they were to share profits and losses equally, agreeing each to devote his time to the business, the plaintiff to draw wages at $11 a day and the defendant at $12 a day.

Mr. Forbes invested $650 under an agreement to buy a half interest in a string of tools owned by Mr Becker for $4,000, the balance to be paid from the earnings of the tools.  There had been considerable talk of forming the partnership for some time before it was formed.  Mr. Becker called Mr. Forbes on the morning of September 27th, and at that time he had a prospect of a drilling contract with a Mr. Sherry, and Mr. Becker and a Mr. Gibson had caused the guardian of Miller Tiger to advertise an oil and gas lease for sale.  On September the 28th, Mr. Forbes drove Mr. Gibson to Eufaula, where Mr. Gibson purchased the lease, paying a bonus of $1 an acre, taking it in his name and in the name of Mr. Becker, and on the same day Mr. Becker went to Tulsa to see Mr. Sherry.  During a drive from Sapulpa to Drumright on the 27th, when the partnership was finally formed, there was talk of this lease.  The plaintiff claims that it was understood that if they should get it, Mr. Becker's interest would be a partnership interest, and that they would pay for the partnership interest by the drilling.  Mr. Becker denied that, and testified that he told the plaintiff that if he and Mr. Gibson got the lease the partnership would get a drilling contract to the Layton sand, and that if the plaintiff would stay with him he would give him an interest to that sand.  They both testified that Mr. Becker said that if they got a 50 barrel well on the lease it would make them $150 each (probably monthly), and would relieve them from financial worries.

Before they drilled on that lease they got a contract to drill a well for Mr. Sherry, near Kelleyville, which was completed in about 115 days, as a dry hole.  They got $8,000 and an interest in Mr. Sherry's lease.  They lost $424.46 on that venture.

They then began work on the Miller Tiger lease.  Before operations were begun an undivided one-half of that lease had been sold to obtain money with which to drill the well, including the money to be paid to the partnership under the drilling agreement, so that the interest standing in Mr. Becker's name was reduced to an undivided one-fourth interest, which is the interest which is involved in this suit.  After this well was down about 100 feet, the plaintiff went to move the tools that had been used in drilling the well for Mr. Sherry to another location to drill another well for Mr. Sherry on another lease, for $7,000 and an interest in that lease, and he did practically no more work on the Miller Tiger well.  At about 1,575 feet, in the Layton sand, about the middle of April, 1925, this Miller Tiger well was completed as a dry hole and then went to water.  The plaintiff was at the lease the day after it was completed and after it had gone to water.  Mr. Sane, one of the workmen, testified that he there asked the plaintiff if he had "any interest in the well," or had "lost any interest in the well," and that the plaintiff replied.  "Not a damned bit more than you have."  The plaintiff at first denied having had a conversation with Mr. Sane, but later admitted a conversation, but said that Mr. Sane had asked him if he was "as sick of this graveyard as the rest of us," and that he had made the reply,

"Not a damned bit more than you are." Up to that time the plaintiff had only received for his services an advance of $250, which was half of $500 that Mr. Becker loaned the partnership after the first Sherry well had been completed at a loss; Mr. Becker had also paid about $135 board for the plaintiff, and had also given him a check for $15. In addition to those advances, during the existence of the partnership Mr. Becker advanced the plaintiff $75 in money, but it does not appear how much, if any of that, was advanced before the Miller Tiger well went to water. As soon as the Miller Tiger well went to water, they both worked finishing preparations to drill the second well for Mr. Sherry near Kelleyville, and in drilling it. It was completed July 15, 1925, as a dry hole, and during the work on that well, after the Miller Tiger well had gone to water, the plaintiff withdrew some heavy advances, having drawn $275 April 21st, $100 June 1st, $100 June 15th, $200 June 21st, and $400 July 15th, the day of the completion of the well as a dry hole, which was the last day he worked for the partnership. He then went to Texas before this well was plugged by Mr. Becker, and stopped there about ten days or two weeks and worked some while there. He then went home to Bloomington. Ill., for about the same length of time. He appeared in Drumright in August and stayed two days, and while there was at the Miller Tiger lease, when, according to the defendant's testimony, he, the defendant, had contracted to deepen the well to the Peru sand and had reached it and it had proven dry, and the defendant asked the plaintiff if he was ready to go to work; and he replied that he was not, that he had a job in Texas and that he was going to go to it. There was a dispute as to the remainder of the conversation. The parties both admitted that the plaintiff mentioned the fact that the partnership had not made money. The plaintiff said that he also gave his financial condition as a reason for leaving. The defendant denied that plaintiff's financial condition was mentioned, but he admitted saying that if things didn't pick up he would have to take a job himself. He also said that when the plaintiff said he was going he added that he liked that work better than "running tower" and that he, the defendant, told the plaintiff to suit himself. They brought it out on cross-examination of the defendant that he also said, "Good-bye Tommie: I don't blame you a bit: there are no hard feelings," but the defendant denied that Mr. Forbes suggested that the defendant remain on the job. Nor did Mr. Forbes testify to any such statement,

although he had alleged it in his petition. There was no further communication between the parties until Christmas. Mr. Becker brought in a gas well in the Bartlesville sand, about 1,100 feet below the Layton sand, which on September 9th gauged five and a half million feet. He testified that this was under a contract made after he had reached the Peru sand. The plaintiff apparently did not even know that a well was in until the middle of November when a brother from Illinois visited the sister at Drumright and then went to Texas to visit the plaintiff. He remarked in the presence of a contractor that Mr. Forbes was a producer—that they had got production on a lease in which he had an interest. The plaintiff testified that he did not ask the brother about the well until after the contractor left, and that the brother could not give him any information, although he did tell him that Pat Cawley, the sister's husband, who had in his name a one-sixteenth interest in the lease, which belonged to his wife, was elated. The plaintiff returned to Drumright on Christmas Eve and went to his sister's home late in the night. He saw both the sister and Mr. Cawley the next morning, but he testified that the well was not mentioned, but then admitted the fact that there was a well mentioned, but nothing further was said about it. Pat Cawley had been present when the well was gauged, September 9th, and the sister had deposited a production check December 22nd. The plaintiff gave as a reason for not seeking information from them his desire to see Mr. Becker, who would know. He testified that when he met Mr. Becker that day, Mr. Becker suggested going to his home, and that he talked considerably about having been in the hospital and was evasive about the well, and that he did not ask him a direct question, but that Mr. Becker said that the well was a little one and apt to go to water at any time, but he would give the plaintiff $1,500 in settlement of the partnership affairs and would take his chances on getting it back out of the lease. The defendant denied any such conversation, and said that he asked the plaintiff whether he wanted to settle on a partnership basis or take wages and reimbursement for his investment in the tools, telling him that on a partnership basis he would lose, and that the plaintiff elected to take the balance of his wages, which were $850, and his investment in the tools, $650, both aggregating $1,500, and expressed himself as well pleased. The defendant also testified that the plaintiff remarked that the defendant "had a nice little well there," and that he assented to it.

It appears that to and including July 15, 1926, the plaintiff had received advances aggregating over $1,165 more than the advances made to the defendant, and that there was due the plaintiff a balance of $850 for wages for 215 days' work, and was due the defendant $2,365 on his wages for 230 days' work. The plaintiff claimed that in going over the affairs they not only figured on the two Sherry wells, but also on the Miller Tiger well to its entire depth. The defendant denied that on the Miller Tiger well they figured past the Layton sand. The defendant, at the time of settlement, had all his checks, and also had with him the partnership account, and they went over them, one reading the checks and the other checking the account against them.

No further communication was had between the parties until the next June except that the $1,500 was remitted in installments, and a letter was written from the plaintiff to defendant on receipt of a check for $400 sent in final payment of the $1,500, which he thought to be $50 too much, and an answer was written by the defendant. When they met in June the defendant told the plaintiff he intended to drill another well on the Miller Tiger lease and offered him work on it. The plaintiff went to work on the well in September and worked on it until late in November. He testified that he worked only the early part of November, but wages were paid him for 19 days worked that month. They topped the sand Armistice Day, November 11, 1927, and deepened the well a foot or two at a time until it produced 500 barrels of oil daily. The plaintiff visited Fairview Thanksgiving Day, and on his return told the defendant that he had not been treated right in the settlement. He testified that his suspicions had been aroused by outsiders telling him about the time he begun work on this last well that he had just about given away his interest in the lease. It is undisputed that on the discovery of the gas well the lease became worth from $75,000 to $100,000, but Mr. Sherry, an expert, said that the value was largely due to prospects of development and that it was considerable of a gamble, that a well drilled too far into the Bartlesville sand was apt to go to water, but that he would not expect that gas well to do so. The plaintiff admitted that the gas well was a little well and apt to go to water at any time. Mr. Sherry testified that when the gas well was brought in Mr. Becker had told him that Mr. Forbes had had an interest in the lease but had forfeited it by going off to Texas and leaving him. The plaintiff contended that partnership tools were used in drilling and in deepening the gas well, and it seems that some of them were so used, but most of the tools were other tools belonging to Mr. Becker, he having owned the heavy part of another string, in which the partnership agreement permitted the plaintiff later to purchase a half interest for $2,000, the partnership, the plaintiff said, to be permitted to use them without hire, but the defendant qualified that statement by saying that it was agreed that the tools could be used back and forth.

At the time of the conversation in August there was something like $1,900 due the partnership and unpaid, and it had some bills payable, which Mr. Becker later paid. At the trial the defendant had his checks and the partnership account, but did not have his bank book. The banker was present with his records, but he did not have his records covering the last part of 1926, and he testified that he inadvertently overlooked them in gathering up his papers. At the close of the testimony the plaintiff's attorneys admitted that aside from the claimed interest in the lease, the settlement made was probably fair. The partnership statement and checks show in final settlement that when the conversation was had in August, balancing up, including bills receivable and bills payable and also including advances and balances due the partners for wages, there was a deficit of $1,504.98, one half of which, $752.49, was chargeable to plaintiff and reduced the amount due him to $97.51, leaving him his investment in the tools in addition.

There was no request for special findings or conclusions, and the decision must be considered as a general finding in favor of the defendant, and if, under the principles of law applicable to the case, the general finding in favor of the defendant would sustain the judgment, the judgment cannot be reversed unless it be held that such finding was against the clear weight of the evidence. Wataske v. Tiger, 88 Okla. 77, 211 Pac. 415; McClintick v. Ellis, 67 Okla. 75, 209 Pac. 403; Oklahoma Digest, Ann., Appeal and Error, sec. 595, V. 6, pp. 129 et seq.

A material point in the case is the determination of when the partnership terminated. It is clear from the evidence that the partnership was terminated by the conversation had in August, 1926. A partnership status results from agreement, and even though it is for a fixed period, or there are unperformed partnership obligations existing, a partner may abandon the partnership and terminate it as to himself at any time, subject, of course, to liability in damages to the other partner or partners if

:such termination should be a breach of the contract. Section 8132, C. O. S. 1921, reads:

"A general partnership may be dissolved as to himself only, by the expressed will of any partner, notwithstanding his agreement for its continuance, subject, however, to liability to his copartners for any damage caused to them thereby, unless the circumstances are such as entitle him to a judgment of dissolution."

In this case, upon the declaration of the plaintiff of an intention to abandon the partnership, there was an assent by the defendant, so that it resulted that there was an agreed termination of the status on that day.

It is not only noticeable that the testimony showed no arrangement for the defendant to remain on the work as a partner after the departure of the plaintiff, although such an agreement had been alleged in the petition, but on the contrary there is much force to Mr. Becker's having bid Mr. Forbes goodbye, and saying he did not blame him and that there were no hard feelings, and also there was a line of conduct prior to that conversation and after it, up to the day of settlement in December, that seems inexplicable on any other theory than that the partnership terminated in August.

Outside of such part of the $75 in money that had been advanced to the plaintiff as he might have received up to the middle of April when the Miller Tiger well went to water, he had only received the $250, the payment of $135 on his board, and a check for $15 more, and apparently he had managed to get along well enough on that from the preceding September, when the partnership was formed, and he could have had little, if any, money in September, for he had to obtain from home the money with which to make the $200 payment requisite to make up his investment of $650 in the tools. But after the middle of April, just as soon as they left the Miller Tiger lease to complete the second well for Mr. Sherry, he put into operation what seems clearly to have been a plan to withdraw from the partnership at the earliest opportunity, and to do it after getting as heavy advances as possible, and without regard to the financial condition of the partnership with reference to indebtedness to Mr. Becker or to others. He withdraw $1,075 between April 21, 1926, and July 15, 1926, and of that $800 was withdrawn during June and to the middle of July, and the last $400 of it was withdrawn on July 15th, the day the second Sherry well was completed as a dry hole, the last day the plaintiff worked, only about a month prior to the conversation in August. It does not appear that he had to pay out

the money on indebtedness, but it rather appears that he had plenty of money to permit him to run around the country. If he had paid debts, it should have re-established his credit sufficiently to have enabled him to remain for the completion of a well which, barring accidents, would have been completed, and was completed and gauged, by the 9th day of the following month. Besides that, at the time he left there was about $1,900 due to the partnership and unpaid, most of it due from Mr. Sherry, and while the partnership had bills payable, Mr. Becker's generosity was such that in all probability the plaintiff could have managed to obtain from the partnership sufficient money upon which to live without utilizing his credit much, if at all. Mr. Becker's statement that the plaintiff's financial condition was not mentioned seems much the more reasonable, as we wonder how, in view of the heavy advances recently made to him, the plaintiff could have had the temerity to assign his own personal financial stringency as a reason for his threatened delinquency.

We interpret the statement in the defendant's answer that it was agreed on the day of the settlement that the partnership be terminated, as meaning that it was agreed that then final settlement had been made, and taking the answer in connection with its recital of a previously existing, abandoned partnership, and with the evidence, it is clear that both parties understood in August that the status had then terminated. And the defendant's remark that by leaving him the plaintiff had forfeited his interest in the lease means no more than that he had no interest because the partnership had been terminated. It was the remark of a layman and we do not construe it as expressing an idea of a technical forfeiture, but merely a failure to have what the plaintiff would have had if he had gone on. We have no doubt from Mr. Becker's former generosity, and from his generosity shown in the settlement, that whether the plaintiff had had an interest beyond the Layton sand or not, had he remained he would have had such interest. Our conclusions are drawn from the record as a whole and not from disconnected remarks and incomplete phases of the relationship.

The plaintiff insists upon recovering an undivided one-half interest in the undivided one-fourth interest in the Miller Tiger lease standing in Mr. Becker's name, upon several grounds, to wit, that the interest held in Mr. Becker's name was a partnership asset, that the well was deepened by the use of partnership funds, and also was deepened by the use of partnership tools.

In considering these claims we should bear in mind that the partnership terminated in August. Bearing· that in mind, it may be conceded for argument's sake that the interest was a partnership asset at the time of the termination of the partnership status. As to the use of partnership funds, it is reasonably clear from the evidence that upon a settlement, aside from any market value which could be attached to the interest in the Miller Tiger lease, at that time, which seems never to have been considered, there was only about $97.51 which would be due plaintiff on liquidation of the partnership affairs as of the date of termination of the partnership. As to the use of partnership tools, the plaintiff's investment in the partnership string was only $650 on a price of $4,000 for a half interest, and since it was the heavy part of another string of tools of Mr. Becker's 'which constituted most of the tools used in drilling and in deepening the well, only what appears to have been a small part of the partnership string having been so used, it seems clear that there were sufficient partnership tools which were not used in this work ·to leave the plaintiff's investment entirely safe and not subjected to the hazards of such use. Besides that, it would seem fair to assume that since the partnership tools had been used in drilling two wells for Mr. Sherry, there might have been considerable wear on them that would have materially reduced the amount of the plaintiff's investment, but resort to that seems unnecessary.

Little assistance has been derived from the brief of the plaintiff, as it appears to have gone on what seems to have been considered as a sort of universal or general rule that would require the granting of the desired relief by establishment of the above- ·mentioned claims. As a matter of fact, there is no universal rule, and it has been held by the highest authorities that there is not even a general rule that entitles a retiring partner to an interest in firm assets, or requires a partner using firm property or firm funds in his business after the termination of the partnership status to account for or divide profits so made with a former partner.

In a case where parties who had agreed to finance the performance of a contract made with the state violated their agreement after having furnished part of the necessary funds, ,and yet sued for an agreed one-half of the profits, the Ohio court said:

"There is, perhaps, no general rule without exceptions, certainly none that will do exact justice in every case, or that may not do injustice in particular cases. There is one general maxim, however, that is seldom found to fail, to wit, that when a supposed general rule is so applied as to work manifest injustice, it is most likely that it is either misunderstood or misapplied." Durbin v. Barber and Barney, 14 Ohio, 311.

In that case what had been done had an actual value at the time of the termination of the partnership, a very substantial value, and the court allowed recovery of that part of half of the profits that the capital advanced bore to the entire capital used, less damages suffered by the partner for the breach of the contract. It should be observed that in that case there was a real substantial value in what had been furnished prior to the breach and a certain definite· return to come from performance of the contract with the state, that it could be prorated, and that it was the entire and only return which could come from performance,. and that such a case is unlike the present case where the real reward, the substantial profit, comes from discovery, which not only was wholly contingent, but was also speculative in the highest degree. There was a hole about 1,575 feet deep, but that was a mere physical fact. There was nothing even in the plaintiff's conduct to indicate that even he considered that of value.

In a case decided by the United States Supreme Court, in which surviving partners who had agreed to wind up the affairs of a law partnership were held not liable to account for any part of a contingent fee in a case abandoned by the deceased partner, Denver v. Roane, 99 U. S. 355, 25 L. Ed. 476, that court said:

"By the agreement of copartnership, he had undertaken to share in the labor, and to promote the common interests of the firm and that was the foundation of his right to share in its earnings. It may be that mere neglect of his duty ·would not have extinguished that right, but a repudiation, of his obligations, refusing to act as a partner, or to perform the functions of a partner, is quite a different thing. It may well be considered as a repudiation of the p'artnership. It was said in Wilson v. Johnstone, 16 Eq. Cas. Abr. 606: 'He who acts so as to treat the articles as a nullity as it regards his own obligations, cannot complain if they are so treated for all purposes.' It may, therefore, very justly be held that by his action Mr. Hughes became a stranger to the case, and repudiated any relation he had previously held to it as a partner in the firm. The partnership ceased as respects that claim. The other p'artners who continued to attend to the case could charge the client nothing for his services, for as the contract was contingent on success, nothing was due to any partner until success was attained."

And in a case where war terminated a partnership agreement and a partner was in-

debted to the firm in an amount exceeding the value of his interest, and the other partner, instead of selling off the assets, took them over at an appraised value which he had fixed by a disinterested appraiser, the Virginia court said:

"It is claimed that it is immaterial what the condition of the partnership affairs was at the time of dissolution; what was the interest of the partners respectively; what proportion of the capital had been contributed by either partner, or whether the outgoing partner had withdrawn his input, yet, if the stock of the firm is carried over into the new business, and not sold at public auction, the outgoing partner is still entitled to have an account and share in the profits. This proposition cannot be maintained in the broad and unqualified manner in which it is stated. The authorities relied upon do not sustain it; but, on the contrary, it seems to be well settled that there is no uniform rule applicable alike to all cases. In Pars. on Part. 524, the author, referring to a number of decisions on this subject, says: 'In regard to the terms of the account and settlement, and the charges, credits, or allowances to be made, it has been conceded by the highest authority that specific rules are of little use, because the justice of every case requires that its peculiar facts and merits, the nature of the trade, the conduct of the parties, and all the various circumstances which affect the rights of the parties, must be taken into consideration, to determine what they are or should be.' * * *

"In Willit v. Blanford, 1 Hare's 253, Vice-Chancellor Wigram, after reviewing all the English cases, decided up to that time (1842), said: 'I feel myself bound, therefore, by authority and reason, to hold that the nature of the trade, the manner of carrying it on, the capital employed, the state of accounts between the parties, etc., may materially affect the rights of the parties.'

"Again he says, in the same case, page 269: 'I have again considered the subject, and read the cases to which I was referred, and I remain of the opinion I expressed at the close of the argument, that there is no rule of this court applicable alike to all cases, and that there is no rule which is so established, or general in its application, that it is to be taken to be the general rule, until circumstances are shown which displace it. The facts of each case must be fully brought under the view of the court before it can be in a position to state what justice to the parties seeking its protection may require with due regard to the interests of other parties. No one can attend to the elaborate judgments of Lord Eldon in Crawshaw v. Collins, Brown v. DeTastet, and even in Cook v. Cullingridge, without being satisfied that his mind saw the impossibility of subjecting cases so various as those of trading partnerships to any universal rule.

And I think it is impossible to consider the subject abstractly upon authority, without feeling satisfied that justice would be endangered by an attempt to subject all cases of this description to any uniform rule.' See, also, Pars. on Part. 523, and cases there cited in note.

"In Wedderburn v. Wedderburn, 15 Eng. Ch. R. 722, Lord Cottenham held that there was no absolute rule on this subject, but each case must depend upon its own peculiar facts, depending upon the state of accounts, the capital employed, etc.

"In the same case, coming up again in 1856, it was held by Sir John Romilly that the liability to account for profits derived from the trade carried on (after one partner had retired, or was dead, or became bankrupt), must depend on the nature of the trade, the mode of carrying it on, the capital employed, the state of account between the parties, and the conduct of the parties afterward." Taylor v. Hutchison, 25 Gratt. (Va.) 536, 18 Am. Rep. 699.

The Virginia case turned on the matter of risk of assets in trade, and since the plaintiff had no assets, none were risked and he was denied a share of the profits.

Even the Ohio case recognized that there was at least no universal rule requiring a sharing of profits, and that the real object in the settlement of partnership affairs is always what is just in the particular case. Further, what had been done before breach in that case entered into a recognized value, whereas, in the present case, not only the desired profit, discovery, but even the getting out without loss on the contract at the contract price for the additional drilling, was speculative and due to contingencies, because not only is discovery entirely speculative, but even the performance of a drilling agreement within a contract price such as was paid in this case might be considered somewhat speculative on account of the known hazards in the drilling business.

The present case is decidedly similar to the case of Denver v. Roane, supra, and to the case of Taylor v. Hutchison, supra, in that, as in the former case, the real controversy is over what was contingent and speculative at the time of the termination of the partnership status, and that, as in the latter, there was a very much similar situation with reference to the condition of the partnership, the state of accounts, and the partnership assets, one partner having gone on as owner of the assets, and the other being indebted to the partnership to an amount in one case more than equalling his interest, and in the present case to nearly as great an amount.

And, considering the matter from the standpoint of risk involved, upon whom did

it rest? The use of the $97.51, if it was used, was a small matter. There was no jeopardy to the interest in the tools, because, since only a small part of the partnership string was used, there was out of use and out of danger a part of the string worth many times the plaintiff's investment in them. On the other hand, Mr. Becker's investment and affairs were in jeopardy because he had the sole risk of the drilling and and had to pay wages to another man to do the work that the plaintiff would have done had the partnership continued, and the plaintiff withdrew his services, which were the important factor of his investment, invested them in a job for which he received wages, and retained the wages, so that in addition to the heavy advances which he had received prior to the termination of the partnership, which he retained and kept out of danger, he also drew his wages and retained them and kept them out of danger, even up to the middle of November, three months after the termination of the partnership, at which time for all he knew or would have known but for the visit of the brother, the defendant might still have been engaged in the performance of his drilling agreement, delayed by any one or more of the hazards of the business, and steadily losing money by reason thereof, and have failed to discover either gas or oil to compensate him for the risk or loss.

By the settlement which was made at Christmas, the plaintiff was relieved of the half of the deficit, $752.49, and was repaid his entire investment in the tools, after having had the use of them in the drilling of two wells for Mr. Sherry, and he was thereby more than compensated for the use of $97.51, if it had been used by Mr. Becker, for the use of the tools, and for any value which there might have been in the one-half interest in the one-fourth interest in the lease at the time of the termination of the partnership in August, if he then had any such interest.

In view of all of the facts and circumstances of the case, we have no hesitation in condemning an effort to set aside the settlement and to establish an interest in the lease as in no way appealing to the conscience of a court of equity.

The plaintiff also alleges as error a statement of the trial court to the effect that the burden was upon him to prove the Miller Tiger lease to have been a partnership asset. In view of the fact that the trial court also said that the evidence was in hopeless conflict upon that point, had the ruling as to burden of proof been error, and had the case turned only upon that point,

such error would have required a reversal of the judgment. Rogers v. Harris, 76 Okla. 215, 184 Pac. 459. However, that was not the only issue in the case, and as has been seen the judgment was correct on other issues which were determinative of the rights of the parties.

The plaintiff contended that since the defendant in his amended answer denied that the plaintiff ever had any interest in the Miller Tiger lease, and denied that it was a partnership asset, that since at the trial he admitted that the plaintiff had an interest to the Layton sand, he could not deny that the lease was unqualifiedly a partnership asset, because, having denied that it was such in his answer, he was bound by the answer. Cases of admission were cited, but the denial was not an admission. The admission, if we can consider it an admission, took place at the trial and only admitted part of the plaintiff's contention. Further, according to Mr. Becker's testimony, the interest was at least contingent on Mr. Forbes staying with him, and he may well have considered that both that and successful discovery were conditions precedent to the vesting of any interest, in which case there would not even be a variance. But at most there could only be a variance, and since it does not appear that the plaintiff was misled or claimed to be misled, the variance cannot be a subject of complaint. Section 312, C. O. S. 1921, vol. 1, p. 442.

The plaintiff contended in the brief that certain findings of the court were in his favor, but it is observed that no special findings were requested, and there is contained in the journal entry of judgment a general finding of the issues in favor of the defendant. No special findings of fact or conclusions of law were requested, and. therefore, this court will look only to the judgment and will not consider any review or reference to the evidence made by the trial court in announcing its decision. Guss v. Nelson, 14 Okla. 296, 78 Pac. 170; Gates v. Settlers' Milling, Canal & Reservoir Co., 19 Okla. 83, 91 Pac. 856; James v. Coleman, 64 Okla. 99, 166 Pac. 210; In re Conroy's Estate (Wyo.) 211 Pac. 96; Dixon v. Stoetzel, 136 Okla. 302, 276 Pac. 730. Further, there was no specific finding on the issue of the termination of the partnership in August, 1926.

The plaintiff contended in his brief that the defendant had abandoned the defense of abandonment of the partnership by his conduct in not calling the issue to the attention of the court in answer to a statement by the court, after the evidence was in,

of the issues involved in the case. As a matter of fact, the attention of the parties as well as the attention of the court was directed very closely to the question of whether or not the lease had been a partnership asset not limited to the Layton sand, and to evidence on that point, and the answer to the court was to the effect that even though it had been a partnership asset, that would not be material if there had been a valid settlement. At one point in the case the attorneys for the plaintiff excused themselves to the court for an oversight in answering by saying that it had only been due to the confusion of the trial. Certainly the defendant's attorneys were just as excusable. Further, the court was not led into error, because the judgment was correct. In view of the evidence in this record, this court would not feel justified in sweeping it aside and refusing to consider the matters of abandonment and termination. nor could it reverse the judgment so manifestly correct.

The judgment of the trial court is affirmed.

CLARK, V. C. J., and RILEY, HEFNER, CULLISON, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., absent.