### MURPHY v. KERR.

(District Court, D. New Mexico. December 20, 1923.)

No. 942.

1. Waters and water courses ⬥35—Ownership of waters of streams is in state, in trust for public.

In such Western states as have adopted the "Colorado doctrine," which rejects the common law as to riparian rights, the ownership of the waters of natural streams is in the state, in trust for the public, and individual rights in such waters can be acquired only by appropriation and application to beneficial use.

2. Waters and water courses ⬥142—Water right is appurtenant to land on which water is applied to beneficial use.

The usufructuary right to water, or water right, is appurtenant to the land on which the water is applied to beneficial use, and is distinct from, and independent of, the property right in the diversion dam, canals, ditches, and reservoirs by which the water is diverted, stored, and carried to the land for use thereon.

3. Waters and water courses ⬥133—What constitutes lawful "appropriation."

An "appropriation" of water is effected by its lawful diversion from a natural stream for the purpose of applying it to some present or contemplated beneficial use and its actual application to such use within a reasonable time.

[Ed. Note.—For other definitions. see Words and Phrases, First and Second Series, Appropriate–Appropriation.]

4. Waters and water courses ⬥140—Priority of appropriation gives priority of right.

Priority of appropriation gives priority of right, as between two appropriators from the same stream, to divert and apply the water to beneficial use.

5. Waters and water courses ⬥133—Physical works necessary to perfect "appropriation."

In order to perfect an "appropriation," there must be the physical works by which the water is diverted and carried directly to the land for beneficial use thereon, or carried to storage reservoirs where it is stored temporarily and then carried to the land for beneficial use thereon. ·

6. Waters and water courses ⬥144½—Works for diverting and carrying water are separate and distinct from easement to maintain same; "land."

Canals, ditches, and other works for diverting water and carrying it to the place of use are "land," and separate and distinct from the ease-

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ment to maintain the same, where they are on lands of another than the water appropriator, which is an *incorporeal hereditament.*

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Land.]

**7. Waters and water courses ☞144½—Property in water right and in works for diverting and carrying water separate and distinct.**

The property right in a water right or usufructuary right is separate and distinct from the property right in the ditches, canals, or other works constructed to divert, conduct, or store the same.

**8. Waters and water courses ☞254—Owner of irrigation works is agent for carrying water to users.**

Where land to which a water right is appurtenant and the works for diverting and carrying the water to the land are the property of different owners, the owner of the works is a carrier and intermediary agent of the owner of the land.

**9. Waters and water courses ☞254—Owner of land and water right has "easement" in carrying works.**

In such case, the owner of the land and water right has an estate of "easement" in the carrying works, which remains unaffected by their conveyance to a new owner.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Easement.]

**10. Covenants ☞70—Covenant in deed to supply water for irrigation of land conveyed held one running with the land.**

Where the owner of lands, on which was a dam, pumping plant, and pipes by means of which water from a stream was conveyed to a reservoir for use in irrigating a portion of the land, sold and conveyed the irrigated portion, with the appurtenant water right, by a deed in which she covenanted on behalf of herself, her heirs and assigns, to have water pumped to the reservoir so long as the dam or any substitute therefor should be maintained, such covenant *held* one running with the land, and to give the grantee an easement in the dam and carrying works, and the right to demand its performance by a subsequent grantee with notice of the land on which they were located.

In Equity. Suit by William F. Murphy, receiver of the Carlsbad Light & Power Company, against Cesarino A. Kerr. Decree for defendant.

John F. Simms, of Albuquerque, N. M., for plaintiff.
C. J. Roberts, of Santa Fé, N. M., for defendant.

PHILLIPS, District Judge. This is a suit brought by the plaintiff against the defendant to quiet the title to a tract of land situated in Eddy county, N. M., consisting of a hydroelectric power plant, with dam, reservoir, power house, and real estate used in connection therewith, which is more particularly described in the bill herein.

Defendant filed an answer and cross-complaint, in which she alleges that she is the owner of an easement in the real estate described in plaintiff's bill, or right to have water carried from and through the irrigation works situated on the real estate described in plaintiff's bill, to a reservoir situated on her lands, under and by virtue of a deed from Mary E. Tansill, the predecessor in title of the Carlsbad Light & Power Company, to the defendant, which deed conveyed to her

certain lands and water rights and contained certain covenants here-inafter fully set out.

Defendant also alleged she had acquired such easement by user.

The parties entered into and filed herein an agreed statement of facts, in which they set out, among others, the following facts:

That the plaintiff, William F. Murphy, is the duly appointed, qual-ified, and acting receiver of the Carlsbad Light & Power Company, appointed by the above-named United States District Court, in equity suit No. 892, and that this suit was brought by him as such receiver by direction and permission of said court, and as ancillary to said equity suit No. 892; that said receivership is under and by virtue of the laws of the state of New Mexico, and that the plaintiff, as such receiver, holds the title to all of the property, real, personal, or mixed, of said cor-poration; that prior to the year 1895, one Anna O. Hagerman was the owner of the real estate described in copies of deeds attached to the agreed statement of facts, marked Exhibits A and B, and that said real estate was contiguous, and that the Pecos river flowed through a portion of said lands; that during the time Anna O. Hager-man owned said land, and prior to the conveyance by her of any part thereof, she and her husband, J. J. Hagerman, had and maintained a home and residence upon that portion of the real estate described in the deed marked Exhibit A, and during said time constructed a dam across the Pecos river, upon the lands described in Exhibit "B," that said dam, when first constructed, was used for the purpose of pro-viding power for the pumping of water to a reservoir located upon the northeast quarter of the southwest quarter of section 5, town-ship 22 north, range 27 east, in which reservoir waters were stored for the purpose of irrigating said lands described in said Exhibit A; that after the construction of said dam Anna O. Hagerman pump-ed a portion of the waters impounded by said dam by means of the power generated by waters impounded therein, and used the same for irrigation purposes upon the lands described in said Exhibit A; that on July 16, 1901, Anna O. Hagerman and J. J. Hagerman conveyed to one Robert W. Tansill all the real estate described in said Exhibits A and B, together with the dam and power plant above referred to, and all water rights appurtenant thereto; that thereafter Robert W. Tan-sill died, leaving a last will and testament, which was duly probated, and which devised the lands described in said Exhibits A and B, to-gether with the water rights appurtenant thereto, to Mary E. Tan-sill; that Mary E. Tansill continued to generate electricity for pow-er purposes by means of the power afforded by said dam and supplied the same to citizens of Carlsbad, N. M., for light and power purposes, and also used the same to pump water to the reservoir located on the lands described in said Exhibit A; that on the 9th day of May, 1907, Mary E. Tansill executed and delivered to the defendant, whose name at that time was Cesarino A. Lewis, a warranty deed, a copy of which is attached to the agreed statement of facts, being Exhibit A, referred to above, and being the deed referred to in defendant's answer and cross-complaint; that said deed was duly recorded in Book 17 of the records of Eddy county, N. M., at page 390, on June 8, 1907; that

Mary E. Tansill continued to own the real estate described in said Exhibit B until July 9, 1919, at which time she conveyed the same, together with the power plant and dam, and all the rights connected therewith, by deeds to the Carlsbad Light & Power Company, a corporation organized by her on November 27, 1917, copies of which are marked Exhibits B, D, and E,· and attached to the agreed statement of facts herein, the latter two deeds being correction deeds; that the consideration for such transfer was stock in the corporation; that after the appointment of the receiver herein said receiver refused to supply water to the defendant under the terms, conditions, provisions, and stipulations contained in said deed marked Exhibit A, and still refuses so to do, unless said defendant is· willing to pay a reasonable compensation therefor.

The deed from Mary E. Tansill to the defendant, Exhibit A, conveyed certain lands and water rights and contained the following covenants:

"The party of the first part hereby agrees and binds herself, her heirs, executors, administrators, and assigns to have water pumped from the Pecos river at what is' known as the Tansill power dam to the reservoir located upon the property herein conveyed not to exceed 8 hours per each day of 24 hours, it being understood that the second party, her heirs, executors, administrators, and assigns, is entitled to have the water pumped as herein provided whenever she so demands of the persons in charge of said power dam and the plant in connection therewith and the party of the first part further agrees and binds herself, her heirs, executors, administrators, and assigns, to make provision for· having said water pumped as herein provided by any purchaser, lessee, or lessees of said power plant located as aforesaid to whom she or her successors may sell, rent, or lease the same.

"This agreement to pump water as aforesaid shall be binding upon the first party, her heirs, executors, administrators, and assigns so long as said power dam or any substitute therefor may be maintained by her, her heirs, executors, administrators, and assigns.    *    *    *

"However, the party of the second part, in accepting this deed agrees, obligates, and binds herself, her heirs, executors, administrators, and assigns, to never construct or cause or permit to be constructed across the Pecos river any dam or dams that will abut or join on to the property herein conveyed so long as the Tansill power dam is maintained and operated."

Pursuant to the terms of said stipulation certain oral testimony was taken at the trial.

Mary E. Tansill and her successor in title, from the date of the deed to defendant to the date of the appointment of the receiver herein, pumped and carried the water from the dam in the Pecos river to defendant's reservoir, in full compliance with the provisions of said covenants.

There is no controversy as to the facts in this case. Two legal questions are presented: (1) Has the defendant any interest in the lands described in plaintiff's complaint? and (2) Do the covenants above set out in the deed from Mary E. Tansill to Cesarino A. Lewis, the defendant, run with the land on which the dam, pumping plant, pipe line, and other irrigation works are situated, so as to bind the plaintiff?

A determination of the main questions involves a consideration of the principles of the law of waters that have been developed in the arid and semiarid states of the West, and the property rights recognized in connection therewith.

[1] Water running in a natural stream belongs to the public. By statutory enactment the states of Arizona, Colorado, California, Montana, Nevada, New Mexico, Oklahoma, Oregon, North Dakota, South Dakota, Texas, Utah, Wyoming, and Idaho have declared in substance that all waters within the state are the property of the public, or belong to the state. The modern expression is that such waters are owned by the state in trust for the people. Wiel, in his Work on Water Rights in the Western States (section 170, p. 193, vol. 1), says:

"Accompanying this view that the law of appropriation rests upon the inapplicability of any other rule are statutes or constitutional provisions expressly declaring that the ownership of all waters is in the state (or in the public). 'In this and other jurisdictions, where the common law in respect to the use of water and the right thereto is altogether ignored, there has been established, either by judicial decision or statute, or both, as an essential principle, that the water of all natural streams is the property of the public or of the state.'"

See, also, Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 237, 61 Pac. 357; Snow v. Abalos, 18 N. M. 681, 140 Pac. 1044.

A majority of the Western states, including New Mexico, have adopted what is known as the Colorado doctrine. This rule rejects the common-law doctrine of riparian rights in toto, and recognizes the doctrine of prior appropriation and application to beneficial use. Wiel on Water Rights, vol. 1, § 118, p. 141; Trambley v. Luterman, 6 N. M. 15, 27 Pac. 312; U. S. v. Rio Grande, etc., Co., 9 N. M. 292, 51 Pac. 674; Id., 174 U. S. 706, 19 Sup. Ct. 770, 43 L. Ed. 1136; Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 238, 61 Pac. 357; Gutierres v. Albuquerque Land & Irrig. Co., 188 U. S. 545, 23 Sup. Ct. 338, 47 L. Ed. 588; Hagerman Irrigation Co. v. McMurry, 16 N. M. 172, 113 Pac. 823; Snow v. Abalos, 18 N. M. 681, 140 Pac. 1044; Farmers' etc., Co. v. Rayado, etc., Co., 28 N. M. 367, 213 Pac. 202.

In Hagerman Irrigation Co. v. McMurry, supra, the court said:

"The doctrine of prior appropriation with application to beneficial use has definitely and wholly superseded the common-law doctrine of riparian rights in many of the jurisdictions in which irrigation is necessary to the growth of crops, and among them is New Mexico. The 'Colorado doctrine,' as it is termed, first appears as a dictum in Coffin v. Left Hand Ditch Company, 6 Colo. 443 (1882). It declared that, on the ground of imperative necessity, no settler can claim any right aside from appropriation. The decisions of our courts, which had established that doctrine long before it was adopted by statute, have been approved by repeated decisions of the Supreme Court of the United States. Wiel's Water Rights in the Western States, §§ 23, 24, and cases cited; Keeney et al. v. Carrillo, 2 N. M. 480, 492 (1883)—clearly portended the later decisions of this court, positively affirming the Colorado doctrine, which was especially emphasized in Albuquerque L. & I. Co. v. Gutierrez, 10 N. M. 197, 240. That case went to the Supreme Court of the United States, and received its approval in 188 U. S. 545, and an earlier New Mexico case on the subject, United States v. Rio Grande D. & I. Co., 9 N. M. 292–303, had been approved under the same title in 174 U. S. 706. Indeed, riparian ownership, as known to the common law, has never, it would seem, been recognized in New Mexico. As pointed out in Albuquerque L. & I. Co. v. Gutierrez, 188 U. S. 545, by the Mexican law in force here at the time the United States acquired the territory, the use of the water of the streams was not limited to riparian lands, but extended to others, subject to regulation

and control by the public authorities. And the Mexican law, as well as the law of Indian tillers of the soil, who preceded the Spaniards here, as it may be gathered from the ruins of their irrigation systems, did but recognize the law of things as they are, declaring that such must, of necessity, be the use of the waters of streams in this arid region."

The reason for the rule is succinctly stated in the case of Willey v. Decker, 11 Wyo. 496, 73 Pac. 210, 100 Am. St. Rep. 939, in an opinion by Mr. Justice Potter, as follows:

"It is the natural outgrowth of the conditions existing in this region of country. The climate is dry, the soil is arid and largely unproductive in the absence of irrigation, but when water is applied by that means it becomes capable of successful cultivation. The benefits accruing to land upon the banks of a stream without any physical application of the water are few; and while the land contiguous to water, and so favorably located as to naturally derive any sort of advantage therefrom, is comparatively small in area, the remainder, which comprises by far the greater proportion of our land otherwise susceptible of cultivation, must forever remain in their wild and unproductive condition unless they are reclaimed by irrigation. Irrigation and such reclamation cannot be accomplished with any degree of success or permanency without the right to divert and appropriate water of natural streams for that purpose and a security accorded to that right. Thus the imperative and growing necessities of our conditions in this respect alone, to say nothing of the other beneficial uses, also important, has compelled the recognition rather than the adoption of the law of prior appropriation."

While the corpus of naturally running water belongs to the state in trust for the public, the law recognizes a property right in its flow and use, known as the usufructuary right or the water right. Wiel, in his work on Water Rights at page 304, vol. 1, 3d Ed., gives two definitions of a water right, as follows:

"A water right of appropriation is real estate, independent of the ditch for carrying the water, and independent of ownership or possession of any land and independent of place of use or mode of enjoyment, whereby the appropriator is granted by the government the exclusive use of the water anywhere so long as he applies it to any beneficial purpose, and it is an incorporeal hereditament, solely usufructuary, not conferring ownership in the corpus of the water or in the channel of the stream."

"'A water right is a usufruct in a stream, consisting in the right to have the water flow so that some portion of it (which portion the law limits in various ways) may be reduced to possession and be made the private property of an individual.'"

It is therefore the right to divert water from a natural stream by artificial means and apply the same to beneficial use.

Such a right is real estate. Wiel on Water Rights, Western States, vol. 1, § 283, and cases cited note 11.

[2] The usufructuary right or water right is appurtenant to the land upon which it is applied to beneficial use. Snow v. Abalos, 18 N. M. 681, 695, 140 Pac. 1044.

It is entirely distinct from the property right in the diversion dam, canals, ditches, and reservoirs, by which the water is diverted, stored, and carried to the land for beneficial use thereon. The water right is an incorporeal hereditament in the flow and use of the stream as a natural resource. Wiel on Water Rights, Western States, vol. 1, § 280.

[3] The water right or usufructuary right is acquired by perfecting an appropriation. An appropriation has been defined as follows:

"The rule is settled in this state that to constitute a valid appropriation of water there must be (1) an intent to apply it to some beneficial use, existing at the time or contemplated in the future; (2) a diversion thereof from a natural stream; and (3) an application of it within a reasonable time to some useful industry. Beers v. Sharpe, 44 Or. 386, 75 Pac. 717, citing Simmons v. Winters, 21 Or. 35, 27 Pac. 7, 28 Am. St. Rep. 727; Hindman v. Rizor, 21 Or. 112, 27 Pac. 13; Low v. Rizor, 25 Or. 551, 37 Pac. 82; Nevada, etc., Co. v. Bennett, 30 Or. 59, 45 Pac. 472, 60 Am. St. Rep. 777."

"It seems the settled law in the states where irrigation problems have been dealt with that, in order to acquire a vested right in the use of water for such purposes from the public streams, three things must concur: There must be the construction of ditches or channels for carrying the water; the water must be diverted into the artificial channels, and carried through them to the place to be used; and it must be actually applied to beneficial uses, and he has the best right who is first in time." Gates v. Settlers' Co., 19 Okl. 83, 91 Pac. 856.

"It has been repeatedly decided in this jurisdiction that an appropriation consists of an actual diversion of water from a natural stream, followed within a reasonable time thereafter by an application thereof to some beneficial use." Windsor R. Co. v. Lake Supply Co., 44 Colo. 214, 98 Pac. 729.

"The latest definition of the term 'appropriation of water' under the arid region doctrine of appropriation by Kinney, in his work on Irrigation and Water Rights (2d Ed.) § 707, is as follows: 'The appropriation of water consists in the taking or diversion of it from some natural stream or other source of water supply, in accordance with law, with the intent to apply it to some beneficial use or purpose, and, consummated, within a reasonable time, by the actual application of all of the water to the use designed, or to some other useful purpose.'" Snow v. Abalos, 18 N. M. 681, 693, 140 Pac. 1044, 1048.

"The doctrine of prior appropriation is the law governing water rights in this territory, and to constitute a valid prior appropriation of the water of the Rio Grande two things must be established:

"(1) There must be a rightful diversion. (2) An application to some beneficial use." Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 240, 61 Pac. 357, 361.

[4, 5] Priority of appropriation gives priority of right as between two appropriators from the same stream to divert and apply the water to beneficial use. Kinney on Irrigation and Water Rights, vol. 2, §§ 776 to 782, inclusive; Millheiser v. Long, 10 N. M. 99, 104, 116, 61 Pac. 111; Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 240, 61 Pac. 357; Snow v. Abalos, 18 N. M. 681, 693, 140 Pac. 1044. In order to perfect an appropriation there must be the physical works by which the water is diverted and carried directly to the land for beneficial use thereon, or carried to storage reservoirs where it is stored temporarily, and then carried to land for beneficial use thereon.

[6] The character of the property in ditches, canals, and reservoirs is discussed by Mr. Kinney, in his work on Irrigation and Water Rights, 2d Ed., vol. 2, §§ 833, 834, and 1003, as follows:

Section 833: "The works constructed for the means of use of water, consisting of ditches, canals, flumes, or reservoirs, are not in themselves easements, but are land. Where these works are constructed upon the lands of the appropriator, the portion whereon they are located is held by no different title from the rest of the land. The same is also true where they are constructed over lands owned by others than the appropriator. They are still

land, although the fee to the same may belong to a person other than the appropriator. What the appropriator acquires in this instance is not a ditch or canal as an easement, but an easement *for* a ditch or canal or other works, as the case may be. The very definition of the word 'easement' precludes the idea that a ditch or canal in and of itself is an easement. It is simply a privilege or private way, 'in which a particular man may have an interest or right, though another be the owner of the soil.' It is an incorporeal hereditament. Or, again, 'an easement is a liberty, privilege, or advantage without profit which the owner of one parcel of land may have in the lands of another. * * * They are incorporeal.'

"Upon the other hand, the ditch or canal is land; and, being visible and tangible, is corporeal. Because a ditch or canal is dug on land in no way changes its character as land. It is still land, although the bed of the same may be sunk below the surface of the land adjoining it. It has the bed and sides still consisting of the same character of soil or rock as that of the adjoining land, and it is as much a part of this land as though the ditch or canal had never been dug. This may be illustrated by another easement, for a right of way given for a private roadway. Because an easement or privilege is given by the owner of lands to another person to pass over those lands in a private roadway in no way changes the character of the roadway from land, and that, too, although in this case the surface of the bed of the road may be elevated above the surface of the adjoining land. It is still land, and a part and parcel of that adjoining. It is visible and tangible, and therefore corporeal. What is granted is simply the right or privilege to pass over this land, as the easement. This right or privilege is intangible and invisible; hence it follows that the road itself is not the easement. But the easement consists of the invisible, intangible, and incorporeal right or privilege of passing over the road. So it is with a ditch or canal. The ditch or canal itself is not the easement. But the easement consists of the invisible, intangible, and incorporeal right or privilege, or right of way, *for* the ditch, canal or other works, as the case may be, which the owner of certain lands may have over the lands of another. As was said in an early California case, brought in ejectment: 'Substantially the conveyance was of the ditch, for there can be no distinction taken between a "right of way in a ditch" or "for" an existing ditch, and the ditch itself.'

"That a right of way for a ditch or canal is an easement we will concede, and will fully discuss this subject in a subsequent chapter. The only point which we wish to make here is that the character of property in a ditch, canal, reservoir, or other means of diversion and use of water, is not in and of itself an easement or servitude, but is a corporeal estate or land, and relative to which any action at law or in equity will lie which may be maintained as to any other real property.

"The reason that we have elaborated upon this subject to this extent is the fact of the misconception of some of the authorities, including some courts, as to the nature and character of the property in a ditch or canal where it passes over lands of others than those of the appropriator, and the loose expressions found in some of the decisions, to the effect that the ditch or canal was in itself an easement."

Section 834: "Ditches, canals, flumes, and reservoirs used for the conveyance or storage of water are artificial water courses, lakes, or ponds, and are real property, and the rules of law governing the same are, in general, the same as the rules governing other real property. A ditch, canal, or reservoir is not a mere easement or incorporeal hereditament. It is itself land, for the recovery of the possession of which an action in ejectment will lie the same as for the possession of any other real property. An action to quiet title to such property will lie, it being real estate. And although in a suit to quiet title to an irrigation ditch the complaint alleged the plaintiff to be the owner of the ditch in fee, it did not preclude the court from finding that the right or ownership was in the nature of an eastment. One who constructs a ditch on the land of another may acquire title to the ditch by adverse use for the statutory period. Ditches dug for the purpose of irrigating land occupied as a homestead, and where without the use of the water thereon the

land would be of but little value for agricultural or horticultural purposes, are treated as a part of the land itself, and not severable therefrom, and hence, therefore, exempt from liability for debts contracted prior to the issuing of the patent to the full extent to which the homestead is exempt. Nor is there anything in the decision in the case of Mt. Carmel Fruit Co. v. Webster to the contrary, as some have been led to believe. In that case the homestead entryman conveyed 'an interest in appropriated water, and the right to convey the same over and across the land.' This conveyance was attacked as being in violation of sections 2290, 2291, of the Revised Statutes of the United States, as an attempt to alienate a portion of his homestead claim. In deciding against this contention, the court, by Mr. Justice Van Dyke, said: 'Such a transaction, so far from being prohibited by the acts of Congress in question, or against public policy, is favored and encouraged, not only by the legislation of Congress, but by the decisions of the courts, federal and state.' The ruling in this case was correct, as there was no conveyance of any land as prohibited under the Homestead Act. The only conveyance outside of the water right which must have been acquired as a separate right to the homestead, was an incorporeal privilege, right, or easement 'to convey the water over and across the land, the title to which remained in the homestead entrymen.'

"These works are inheritable, and as hereditaments, being substantial, permanent, visible, and tangible, are corporeal."

Section 1003: " * * * When once acquired these easements, or rights of way, together with the ditches or other works constructed over the same, are property rights, and the subject of sale and transfer the same as any other species of real property, and under the same rules of law governing transfers of real property. It therefore follows that the ditch, canal, or other structure, by means of which the diversion of the water is effected, and the rights of way for the same, must be conveyed by a written instrument, as is the case of other real property. A ditch and easement over the land of another may be sold and transferred separate and apart from the land for the benefit of which the right of way was acquired and the ditch constructed. A ditch may also be conveyed reserving the water right, the waters under which right were formerly conveyed through the ditch; and the water right may also be conveyed, and at the same time the ditch and easement therefor may be reserved. It it a separate and distinct species of real property, and therefore may be sold and transferred separate from the water right or any other interest in land. The extent of the servitude is determined by the terms of the grant and the nature of the enjoyment by which it was acquired."

See, also, Fudickar v. East Riverside Irr. Dist., 109 Cal. 29. 41 Pac. 1024; Integral Quicksilver Min. Co. v. Altoona, etc., Co., 75 Fed. 379, 21 C. C. A. 409, 44 U. S. App. 566; Reed v. Spicer, 27 Cal. 58, 4 Morr. Min. Rep. 330; Bashore v. Mooney, 4 Cal. App. 276, 87 Pac. 553.

[7] The property right in the water right or usufructuary right is separate and distinct from the property right in the ditch, canal, or other works constructed to divert, conduct or store the same. Kinney in his work on Irrigation and Water Rights, vol. 2, 2d Ed., § 764, says:

"A water right is a species of property in and of itself, and exists separate and independent of the right to the ditch, canal, reservoir, or other works constructed to divert, conduct, or store the water. This is so although they may be all owned by the same person; and again the water right may be owned by one person and the ditch or other works by another. A valid water right, although intimately related to and connected with the dam and canal, is a different thing, and that, too, although each is necessary to make the other available and useful. They are each capable of several and distinct injuries, giving rise to separate and distinct causes of action for which there are separate and distinct remedies. As was said in an early California case: 'The dam and canal may be trespassed upon, broken down, destroyed, or taken

into possession under a claim of right, without taking away the water, or preventing its use in any other mode or place, or without questioning the plaintiff's right to it, and the plaintiff may have his cause of action for the trespass, or to recover possession of the land constituting the dam and canal, or their site; and the water may also be diverted and taken away without in any way disturbing or interfering with the dam and canal. Ownership of a ditch and the water right for the waters to flow through the ditch may, and often do, exist in different parties. The existence of the one right does not necessarily imply the existence of the other right in the same party.'"

See, also, Snow v. Abalos, 18 N. M. 681, 140 Pac. 1044; Wiel on Water Rights in Western States, vol. 1, § 456, p. 482; Nevada, etc., Co. v. Kidd, 37 Cal. 282; Swank v. Sweetwater Irrigation & Power Co., 15 Idaho, 333, 98 Pac. 297.

In the larger systems it has been the practice for an irrigation company to construct diversion dams, canals, ditches, reservoirs, and other physical works for the irrigation of bodies of land, and to sell the land to be irrigated to farmers and to enter into contracts with the purchasers thereof to maintain the physical works, and to divert, store and deliver, or where storage is not used to divert and deliver to the owner of the water right at the land, the water for beneficial use thereon. The property right in the irrigation works is in the irrigation company, and the water right is appurtenant to the land and belongs to the owner thereof. In other cases the owners of the lands supplied by an irrigation system organize a ditch company in which the stock is owned by the water users. The title to the irrigation works is in the ditch company. It contracts with the landowners to divert, store and carry water as above to their lands for beneficial use thereon. Under such an arrangement also the water right is appurtenant to the land and belongs to the owner thereof, while the property right in the irrigation works is in the ditch company.

[8] The owner of the irrigation works then becomes an intermediary agent of the owner of the land and water right and diverts and carries the water from the natural stream to the land. It is the carrier of the water. Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N. M. 177, 251, 61 Pac. 357; Snow v. Abalos, 18 N. M. 681, 696, 140 Pac. 1044; San Joaquin & King's River C. & I. Co. v. Stanislaus County (C. C.) 191 Fed. 875, 894, 895; Wyatt v. Larimer & Weld Irrigation Co., 18 Colo. 298, 33 Pac. 144, 36 Am. St. Rep. 280; Gould v. Maricopa Canal Co., 8 Ariz. 429, 76 Pac. 598, 600; Wheeler v. Northern Colo. Irr. Co., 10 Colo. 582, 17 Pac. 487, 490, 491, 3 Am. St. Rep. 603; Farmers' Canal Co. v. Frank, 72 Neb. 136, 100 N. W. 286.

In Wyatt v. Larimer, etc., supra, the Colorado court said:

"The decision by the court of appeals in this case was rendered by a divided court. We are unable to see wherein the discussion by the learned judge writing the majority opinion touching the constitutional status of irrigation companies in this state was essential to the decision of the questions involved in the case; but, inasmuch as the views expressed in that opinion are so at variance with numerous decisions of this court, we feel impelled to express our disapproval thereof, and our adherence to the doctrine heretofore announced by this court in relation to the status of canal companies organized for the purpose of carrying water for general purposes of irrigation. We adhere to the doctrine that such a canal company is not the proprietor of the water diverted by it, but that 'it must be regarded as an intermediate agency

existing for the purpose of aiding consumers in the exercise of their constitutional rights, as well as a private enterprise prosecuted for the benefit of its owners.' Wheeler v. Irrigation Co., 10 Colo. 582, 17 Pac. 487; Reservoir Co. v. Southworth, 13 Colo. 111, 21 Pac. 1028; Strickler v. City of Colorado Springs, 16 Colo. 61, 26 Pac. 313; Combs v. Ditch Co., 17 Colo. 146, 28 Pac. 966."

[9] What interest, then, if any, has the owner of the land and the water right in the dams, reservoirs, canals, ditches and other physical works by which the water is diverted and carried to his land? Wiel in his Work on Water Rights in Western States, § 1339, vol. 2, says:

"The water rights and an estate of ownership in the distributing system belong to the consuming public as property, and the canal company is only an agent to enable the consumers (the appropriators) to make beneficial use of their appropriations. This view of the status of the right of a consumer as being per se greater than one of service and as amounting to actual 'water-right' ownership with an 'easement in the ditch or canal' seems to be the rule in numerous jurisdictions."

This view is sustained by the following authorities: Henrici v. South Feather Land & Water Co., 177 Cal. 442, 170 Pac. 1135; Farmers' High Line Canal & Res. Co. v. New Hampshire Real Estate Co., 40 Colo. 467, 92 Pac. 290; Wyatt v. Larimer & Weld Irr. Co., 18 Colo. 298, 307, 33 Pac. 144, 36 Am. St. Rep. 280; People ex rel. Standart v. Farmers' High Line Canal & Res. Co., 25 Colo. 202, 54 Pac. 626; Grand Valley Irrigation Co. v. Lesher, 28 Colo. 273, 65 Pac. 44; Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 Pac. 858, 863, 15 L. R. A. (N. S.) 359; Dorris v. Sullivan, 90 Cal. 286, 27 Pac. 216; Edinburg Irr. Co. v. Paschen (Tex. Civ. App.) 223 S. W. 329; Mudge v. Hughes (Tex. Civ. App.) 212 S. W. 819, 823; Bolles v. Pecos Irr. Co., 23 N. M. 32, 167 Pac. 280.

In the case of Farmers' High Line, etc., Co. v. New Hampshire, etc., Co., supra, the Colorado court, at 92 Pac. 294, said:

"It hardly seems necessary to again state, as this court so often has stated, that the perpetual right to have water carried by a ditch constitutes an easement in the ditch. Wyatt v. Larimer & Weld Irri. Co., 18 Colo. 298–307, 33 Pac. 144, 36 Am. St. Rep. 280; People ex rel. Standart v. Farmers' High Line Canal & Res. Co., supra; Irrigation Co. v. Lesher, 28 Colo. 273, 65 Pac. 44. Such an easement is real estate—a freehold estate. Wyatt v. Irr. Co., supra."

The Supreme Court of California in the case of Henrici v. South Feather Land & Water Co., supra, at 170 Pac. 1137, in discussing the Stanislaus Case, supra, said:

"The case is governed by the principles laid down in Stanislaus Water Company v. Bachman, 152 Cal. 716, 93 Pac. 858, 15 L. R. A. (N. S.) 359. There the court, in speaking of a similar situation, said:

" 'The agreement is, in legal effect, an agreement to sell a right or interest in real property. * * * Hence the agreement to furnish the necessary water from the canal from year to year, during the times specified, and to deliver it upon the ' * * * lands for the irrigation thereof, for an agreed price, was, in substance and effect, an agreement for the sale of real property of the canal company. Such an agreement, with all its terms, is binding, not only upon the maker, but upon all persons who subsequently acquire the maker's title to the property agreed to be sold, with notice of the agreement. The plaintiff (water company), as we have seen, bought with notice, and it is therefore as much bound to comply with this part of the agreement according to its terms as if it had executed the same.'

"This reasoning is equally applicable to the present case. It is true that the contract before us does not provide, as did that considered in the Stanislaus Case, that it should have 'the force and effect of a covenant running to and with' the land of the consumer and the canal of the water company. But, as was held in the case cited, the language quoted was not effective to make the covenant one running with the land, nor did it create a lien on the canal. See Fresno Canal, etc., Co. v. Rowell, 80 Cal. 114, 22 Pac. 53, 113 Am. St. Rep. 112. The real ground of decision was that the agreement to furnish water conferred upon the landowner a specific right or interest in real property, affecting the system of the water company, and that any one purchasing such system with notice, actual or constructive, of the landowner's interest, took subject to it."

In the case of Dorris v. Sullivan, supra, the court held that where one person has water flowing in a ditch, and another person has the right to have part of such water flow from the ditch to his land for its irrigation, the right of the latter is a servitude on the ditch, and is real property. See Stanislaus Water Co. v. Bachman, supra.

In the case of Bolles v. Pecos Irrigation Co., 23 N. M. 32, 167 Pac. 280, decided August 16, 1917, in discussing the relation between the owner of the physical works and the owner of the water right, the court said:

"The contracts provided, among other things:

"That for a named consideration the irrigation company 'does bargain, sell, * * * and convey a designated number of "water rights in said canal" to "be applied and attached to" and be used in conjunction with (designated lands), the "intention of the above conveyance being that each of said water rights shall be and remain a right to receive and use, during each year, from said canal, upon the land named in connection therewith, the amount of water herein specified, and that each of said rights shall be and remain * * * a right incident and appurtenant to said land." '

"The contracts contained this further clause:

"That the irrigation company shall 'permanently maintain the said canal and the flow of water therethrough,' and that the covenantee and the 'heirs, assigns, and successors thereof in ownership of said lands' shall pay the irrigation company certain compensation for furnishing water.

"The contracts further provided that:

" 'All covenants and agreements herein contained, and rights hereby granted to either of said parties shall extend to and be binding upon the heirs, assigns, legal representatives and successors of said party.'

"Under these contracts it will be seen that appellant's predecessor in title was simply a carrier of a stated quantity of water for appellee's predecessor in title. The right acquired by the appellee constituted an easement in the ditch of the appellant. Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 Pac. 858, 15 L. R. A. (N. S.) 359; Wyatt v. Larimer & W. L. Co., 11 Colo. 298, 33 Pac. 144, 36 Am. St. Rep. 280; Beck v. Pasadena L., etc., Co. (Cal.) 59 Pac. 387; Chicosa Irr. D. Co. v. El Moro D. Co., 10 Colo. App. 276, 50 Pac. 731.

"The Pecos Irrigation Company was not bound to retain ownership forever of the land upon which the canal was situate. We know of no doctrine of law which would impress this duty upon it. The proposition seems clear that the parties to these contracts did not contemplate that the convenantor should perpetually be required to perform the covenants therein expressed, regardless of the ownership of the canal. That they contemplated a possible change in ownership and hence a consequent shifting of the burden of performing the covenants therein expressed is clear beyond all question. The corporation, the parties must have known, would eventually expire by statutory limitation. But the contracts negative all idea of casting upon the covenantor, personally, a perpetual duty by providing that the covenants therein contained were binding upon the 'successors' of the parties. There was no occasion for the clause providing that the 'successors,' etc., should

be bound by the covenants, unless it was intended thereby to insure to the covenantee, and those acquiring title from him, that the covenants cast upon the covenantor would be performed by whoever became possessed of the servient estate. The covenants were not personal to the irrigation company. They were personal to the owner of the canal, in the sense that they required of him the performance of something which could be performed only by virtue of the ownership of the canal. The charge was upon the canal; the execution of the covenant being chargeable against the owner thereof.

"A case involving the principle decisive of this proposition is that of Sexauer v. Wilson, 136 Iowa, 357, 113 N. W. 941, 14 L. R. A. (N. S.) 185, 15 Ann. Cas. 54. There the covenantor agreed to maintain perpetually a tight fence between land granted to him and land of the grantor. He erected partition fences and maintained them for five years, when he sold the property constituting the servient estate to the defendant Krausa. The latter failed to maintain the fence, and in an action by the grantor against Wilson and Krausa it was held that Wilson was relieved of further responsibility in the premises after his sale to Krausa, the covenant running with the land. The court said:

" 'Having found that the covenantor's grantee is bound by the covenant, the next inquiry is whether the covenantor also is liable thereon subsequent to parting with title. This necessarily depends on the intention of the parties to the first deed. While the covenant is personal in form, this is not controlling, for the deed must have been executed with the understanding that: (1) Wilson, the grantee, would have no right to enter on the land after passing title to another in order to repair or replace the fence; (2) that he would enjoy no benefit therefrom; and (3) owing to the nature of the covenant neither he nor his representatives could perform by maintaining the fence perpetually. Of necessity the grantor must have relied on the land with which the covenant runs to secure its performance, and, fairly construed, Wilson's obligation was to make the fence and maintain it only during the time he owned the land.'

"The court then stated why the parties must have so intended, saying:

" 'It could not have been his intention to assume an obligation in perpetuam, and, in event of disposing of the fee, to remain bound for life. On the other hand, the grantor naturally had in mind recourse on those who should own the land when the fence should need repair, rather than this grantee who might be gone before this would be required.'

"See, also, Hickey v. Lake Shore, etc., R. Co., 51 Ohio St. 40, 36 N. E. 672, 23 L. R. A. 396, 46 Am. St. Rep. 545, cited by the court in the Sexauer-Wilson Case; supra, and the notes to the latter case as the same appear in L. R. A. and Am. St. Rep.

"No case, applying this principle as between water right owner and water companies, is to be found, but we can see no reason to deny its application in such cases."

The decision of the instant case involves the application of a rule of property. While the decision by the New Mexico Supreme Court in Bolles v. Pecos Irrigation Co., supra, was subsequent to the date of the deed from Mrs. Tansill to the defendant, so that the New Mexico decision is not binding on this court, yet as an authority it is strongly persuasive and ought to be followed, unless this court is of the opinion that it is clearly erroneous.

I am of the opinion that the New Mexico decision announces the correct rule, and that the same is consonant both with reason and authority. In the reclamation of lands in the arid states, the land itself is of small relative value as compared with the water right. Lands worth $5 to $10 an acre without water become worth hundreds of dollars per acre after a water right is secured therefor, and the same are reclaimed and improved by means of irrigation. Where the ownership of the land and the water right is in one individual and the own-

ership of the physical works in a ditch company, unless the owner of the land and water right has an easement in the irrigation system, the future of his water right would be so uncertain and unstable as to render it practically worthless. This would be true because upon the sale of the irrigation works the owner of the water right would lose his right to have water diverted, carried, and delivered to his land by means of such irrigation works unless he could negotiate a new contract with each succeeding owner of the works. The principles of irrigation law have been developed to meet the necessities of the conditions which have arisen in the development of irrigation and are in accord with common sense and reason, and I am of the opinion that the rule announced in the above decision that the owner of the land and water right has an easement in the ditch or canal was adopted by the courts in the irrigation states, because they found that such principle was in accord with justice and common sense and necessary to the protection of the most important property right in connection with irrigation, namely, the water right or usufructuary right.

[10] Applying the principles above set out to the instant case, we find that the defendant is the owner of a water right in the Pecos river appurtenant to the lands conveyed to her by Mrs. Tansill, the predecessor in title of the plaintiff; that the plaintiff is the owner of the diversion dam in the Pecos river, power plant, pumps, and other physical works by means of which water is conveyed from the Pecos river to the lands of the defendant for beneficial use thereon; that in the deed from Mrs. Tansill to the defendant she contracted with the defendant to act as the carrier of this water and covenanted to maintain the irrigation works and carry the water from the Pecos river to defendant's reservoir. This contract and covenant by its express terms bound not only Mrs. Tansill, but her heirs, executors, administrators, and assigns, and inured, not only to the benefit of the defendant, but her heirs, executors, administrators, and assigns. This contract to carry water was not for a definite and limited period, but was for so long as said dam or any substitute therefor should be maintained by Mrs. Tansill, her heirs, executors, administrators, and assigns.

The only distinction between this case and Bolles v. Pecos Irrigation Co., supra, is in the character of the works. In Bolles v. Pecos Irrigation Co., supra, the water was raised by means of a diversion dam built at a point in the river above the lands to be irrigated and was conveyed by intake canal to a storage reservoir and by means of a distributing system to the lands to be irrigated. Such an irrigation system does not work automatically. It requires constant repairs and constant supervision. Employees must be stationed at the intake canal and storage portion of the system to raise and lower the gates, both at the diversion dam and at the storage reservoir. Employees must also look after the distributing system, raise and lower the headgates, divide and distribute water. It therefore requires affirmative acts and affirmative service on the part of the owner of the irrigation works. I can see no difference in fact or in principle between a system which carries the water by means of diversion dams, canals, storage reservoirs, and distributing canals, and an irrigation system which

carries the water by a diversion dam, pump, pipe line, and reservoir. It is therefore my opinion that by the deed set out as Exhibit A to the agreed statement of facts herein the defendant acquired and now owns an easement in the irrigation works of the plaintiff.

Counsel for the plaintiff cite the New York case of Miller v. Clary, 210 N. Y. 127, 103 N. E. 1114, L. R. A. 1918E, 222, Ann. Cas. 1915B, 872, which holds that with certain exceptions affirmative or positive covenants do not run with the land. This case declares the general rule to be that affirmative or positive covenants do not run with the land. It admits certain exceptions to this rule, such as covenants to build fences along boundary lines, covenants relating to party walls, covenants to provide railway crossings, and covenants in leases to pay rent or repair buildings on the demised premises. It also admits that certain American authorities, notably the courts of Massachusetts, announce a contrary rule.

The annotator of the note to this decision in Ann. Cas. 1915B, 877, says:

"The reported case seems to run counter to all of the earlier cases in New York as well as the cases in other jurisdictions."

The following authorities announce the rule that affirmative covenants similar to those involved in the instant case run with the land and bind the successive owners thereof: Bolles v. Pecos Irr. Co., 23 N. M. 32, 40, 41, 42, 167 Pac. 280; Edinburg Irr. Co. v. Paschen (Tex. Civ. App.) 223 S. W. 333; Ford v. Oregon Elec. Ry. Co., 60 Or. 278, 117 Pac. 809, 36 L. R. A. (N. S.) 358, Ann. Cas. 1914A, 280; Grand Valley Irr. Co. v. Lesher, 28 Colo. 273, 65 Pac. 44; Fitch v. Johnson, 104 Ill. 111; Carr v. Lowry, 27 Pa. 257; note, Ann. Cas. 1915B, 375; West v. Probst (Tex. Civ. App.) 251 S. W. 289.

In the case of Fitch v. Johnson, supra, the court said:

"This is an appeal from a judgment of the Appellate Court for the First District, affirming a judgment for the sum of $1,562.52, rendered by the circuit court of Whiteside county, at its March term, 1881, in favor of the plaintiff, in an action for breach of covenant, wherein Levi P. Johnson, the appellee, was plaintiff, and George W. Fitch, the appellant, and Pardon A. Brooks, were defendants.

"The facts as they substantially appear of record, are: That on the 1st day of May, 1873, the Lyndon Hydaulic & Manufacturing Company, a corporation organized under the laws of this state, was the owner in fee of certain real estate at or near Lyndon, in Whiteside county, this state, lying on either side and extending across Rock river, upon which there were in the course of construction a dam across the river, a head race, and other hydraulic works connected therewith, designed to be used in operating a certain flouring mill then being built on a portion of the premises on the north side of the river. That the company, on the day last mentioned, by its deed of that date, containing full covenants of warranty, for the consideration of $20,000, conveyed the mill and the land upon which it is situated, together with a water power equal to 2,500 inches of water under a 6-foot head, to Bradford C. Church and Samuel Patterson, which said deed contained, among others, the following express covenants on the part of the company:

" 'The party of the first part hereby covenants and agrees that it will complete and finish its dam and works in a good and substantial manner, according to the contract between the party of the first part and the original contractor, David B. Sears, and that it will forever keep up and maintain at least a six-foot dam, and all necessary piers, races, bulkheads and gates, so

as to enable the party of the second part, their heirs and assigns, to fully use and enjoy the water power hereinabove granted at all times, unless prevented by some unforeseen accident or casualty to the works of the party of the first part or its grantees. And the party of the first part further covenants and agrees to and with the party of the second part, their heirs and assigns, that in case of any damage being done to the works of the party of the first part by force of the water or ice, or from any other cause, it will, without unreasonable delay, cause the same to be repaired; and in case the party of the first part shall fail or neglect to so make any such necessary repairs for a period of 30 days after the same might have been done, that then and in that case the party of the second part, or their heirs or assigns, shall have the right, after having given to the party of the first part 10 days' notice in writing, to enter upon the works of the party of the first part and make such necessary or reasonably necessary repairs upon the same, so as to enable the party of the second part to enjoy the water power hereby granted, or for the purpose of preventing further damage being done to the works or property of the party of the second part; and for the expenses incurred in so doing, the party of the first part shall be liable in a suit at law for the amount so expended by the party of the second part, less the party of the second part's proportion of such expenses as hereinafter covenanted and agreed to be paid by them.'

"The deed also contained a covenant on the part of the grantees to pay one-tenth of the cost of maintaining and keeping in repair the above mentioned hydraulic works. That the company, on the 9th day of September, 1874, conveyed to Martin M. Potter the dam and other hydraulic works, together with the land upon which they were constructed and located, who afterwards, on the 17th of January, 1870, conveyed the same to Fitch and Brooks. That appellant subsequently, on the 3d of July, 1879, conveyed all his interest in the premises to his son, Frank E. Fitch, the conveyance being recorded on the 19th. That on the 15th of April, 1875, Church and Patterson conveyed to appellee the flouring mill and lot of land upon which it is located, including the water power, and all rights and interests purchased by them from the company, as above stated. That in the month of March, 1879, the dam was partially destroyed by high water and ice. That on the 18th of June, 1879, appellee gave notice to Fitch and Brooks of the condition of the dam, and of his purpose to repair it if neglected by them. That after the expiration of the notice, some time in July, appellee commenced the required repairs and completed the same, at a cost of $1,618.30, one-tenth of which he was bound, as assignee of Church and Patterson, to bear himself. * * *

"Appellant claims that the covenant sued on was a mere personal covenant on the part of the company with Patterson and Church and that the liability to perform it did not therefore devolve upon the assignee of the dam and hydraulic works, and that for the same reason the right to sue upon it did not pass to appellee as assignee of the mill property, or more shortly stated, that the covenant in question does not run with the land. If such is the true character of the covenant, it is hardly reasonable to suppose the parties so understood it, for surely no one capable of contracting would invest $20,-000 in property that might on the next day be rendered almost valueless by a mere transfer of an adjacent estate, or by the sudden insolvency of its owner, which would necessitate such a transfer—the very contingency which happened in this case. The relation between the two properties clearly shows that such could not have been the intention or understanding of the contracting parties. So far as their usefulness is concerned they are dependent on each other. The water power would be useless without the mill, and the mill could not be operated at all without the water power.

"Again, on the one hand, no one except the owner of the hydraulic works, or some one acting under his license or authority, could lawfully perform the covenant to keep the works in repair, for every entry for the purpose of repairs by another would be a trespass. On the other hand, the covenant was of no value to the covenantee except in his character as owner of the mill, and if his right, as owner, to enforce the performance of it by action would not pass to his assignee, it would in effect be to deprive him of one

of the most valuable incidents of all property, namely, the right and power of transfer, for certainly no one would want the property at any price without power to enforce the covenant. The mill without the motive power which the hydraulic works furnished to operate it, would certainly be of but little value. These, and other considerations of a similar character that might readily be suggested, leave but little, if any, doubt that it was the intention of the parties to bind their respective assignees as well as themselves, and we are of opinion they did so.

"The conveyance of the mill and the water power by a deed giving the right of entry upon the adjacent property, under certain contingencies, for purposes of repair, and the covenant therein on the part of the grantor to keep the dam, etc., in repair, we regard as conferring upon the grantees of the mill property and their assigns an easement in the adjacent premises, including the dam and hydraulic works which became, and is, appurtenant to the mill property and hence passed with it to appellee on his purchase from Patterson and Church. And we are of opinion, also, the burden of the covenant to repair devolved upon the assignee of the servient estate upon its transfer by the company, and that such assignee or assignees, whether immediate or remote, are personally liable thereon, in their character as owners of such servient estate so long as it remains in them—or, more shortly, we are of opinion the covenant runs with the land, and it therefore follows, the declaration shows upon its face a good cause of action.

"While it is true the cases are not all in harmony on this subject, yet we are of opinion that by the decided weight of authority the doctrine that covenants run with incorporeal as well as corporeal hereditaments is fully established, and where the owner of certain premises conveys a part of them, covenanting that the purchaser, his heirs and assigns, shall enjoy certain permanent rights in and with respect to the premises retained by the grantor, and also covenants in the conveyance to do and perform, from time to time, certain acts which are essential to the use and enjoyment of the purchased premises, as was done in this case, such covenant, although regarded as a burden, will be deemed to run with the servient estate, and to subject the assignee thereof to its performance. The acts embraced within the covenant being essential to the use and enjoyment of the purchased estate, it must be assumed their performance was intended by the parties to be coextensive with the estate conveyed, which was one of unlimited duration, and we are aware of no means by which such intention can be made certainly effectual except by holding, as we do, the covenant runs with the servient estate, and that the assignee thereof is personally liable thereon. The principle here announced is no new doctrine of this court. It is distinctly recognized in Sterling Hydraulic Co. v. Williams et al., 66 Ill. 393, Wiggins Ferry Co. v. Ohio & Mississippi Ry. Co., 94 Ill. 83, and also in Batavia Mfg. Co. v. Newton Wagon Co., 91 Ill. 230."

It is further my opinion that the covenants contained in the deed are covenants running with the land, and are a charge upon the irrigation system, and bind each successive owner thereof to a performance of the same.

A decree may be prepared in accordance with the decision, allowing plaintiff proper exceptions.